## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | |
|---|---|
| KALSHIEX LLC, | Civil Action No.: 3:25-cv-02016-VDO |
| *Plaintiff*, | |
| vs. | |
| BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut, | |
| *Defendant*s. | DECEMBER 5, 2025 |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

INTRODUCTION ....................................................................................................... 1

BACKGROUND ........................................................................................................ 2

    A.    The Exclusive Federal Scheme for Regulating Futures Markets on
        Regulated Exchanges ............................................................................... 2

    B.    Kalshi's Registration as a CFTC-Designated Contract Market Under
        Federal Law. .......................................................................................... 6

    C.    The Connecticut Regulatory Scheme for Gaming. ................................... 7

    D.    The Department of Consumer Protection's Cease-and-Desist Letter to
        Kalshi. .................................................................................................... 8

ARGUMENT ........................................................................................................... 11

    A.    Kalshi Is Likely to Succeed Because Connecticut's Efforts to Regulate
        Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations. .......... 11

        1.    Connecticut Gambling Laws Are Field Preempted as Applied to
            Kalshi's Event Contracts. ........................................................... 12

        2.    Connecticut Laws Are Conflict-Preempted as Applied to Kalshi. ............. 18

    B.    Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction. ............... 21

    C.    The Balance of the Equities and Public Interest Favor a Preliminary
        Injunction. ............................................................................................. 24

    D.    No Security—Or Only a *De Minimis* Security—Is Appropriate ........................... 25

CONCLUSION ........................................................................................................ 26

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                            **Page(s)**

*Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*,
   977 F.2d 1147 (7th Cir. 1992) ........................................................................6, 7, 18

*Am. Fin. Servs. Ass'n v. Burke*,
   169 F. Supp. 2d 62 (D. Conn. 2001) ........................................................................23

*Anderson v. Vaughn*,
   333 F. Supp. 703 (D. Conn. 1970) ..........................................................................25

*Arizona v. United States*,
   567 U.S. 387 (2012).......................................................................12, 16, 19, 25

*Assocs., Inc. v. Stuart*,
   85 F.3d 975 (2d Cir. 1996).......................................................................25, 26

*Blue Lake Rancheria v. Kalshi Inc.*,
   No. 25-cv-06162, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) ....................................17, 18

*California v. Azar*,
   911 F.3d 558 (9th Cir. 2018) ...................................................................................23

*Cerilli v. Quiros*,
   No. 24-cv-1163 (VDO), 2025 WL 47536 (D. Conn. Jan. 8, 2025) ........................................11

*City of New York v. Permanent Mission of India to U.N.*,
   618 F.3d 172 (2d Cir. 2010)....................................................................................13

*Crosby v. Nat'l Foreign Trade Council*,
   530 U.S. 363 (2000)....................................................................11, 12, 18, 20

*Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*,
   458 U.S. 141 (1982)....................................................................................11, 12

*Ford v. Reynolds*,
   316 F.3d 351 (2d Cir. 2003)....................................................................................23

*FTC v. Ken Roberts Co.*,
   276 F.3d 583 (D.C. Cir. 2001) ................................................................................14

*Hines v. Davidowitz*,
   312 U.S. 52 (1941).......................................................................................11, 12, 19

*INS v. Cardoza-Fonseca*,
   480 U.S. 421 (1987).................................................................................................15

*Int'l Trading, Ltd. v. Bell*,
    556 S.W.2d 420 (Ark. 1977)............................................................................15

*Jolly v. Coughlin*,
    76 F.3d 468 (2d Cir. 1996)............................................................................22

*KalshiEx LLC v. CFTC*,
    119 F.4th 48 (D.C. Cir. 2024)........................................................................13

*KalshiEX LLC v. CFTC*,
    No. 23-cv-3257 (JMC), 2024 WL 4164694 (D.D.C. Sept. 12, 2024) ..............2, 3, 6

*KalshiEX LLC v. Flaherty*,
    No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 (D.N.J. Apr. 28, 2025) ...................... *passim*

*KalshiEX, LLC v. Hendrick*,
    No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282 (D. Nev. Nov. 24, 2025)......................14

*KalshiEX, LLC v. Hendrick*,
    No. 25-7516 (9th Cir. Nov. 28 2025)..............................................................14

*KalshiEX LLC v. Martin*,
    No. 25-cv-1283-ABA, 793 F. Supp. 3d 667 (D. Md. 2025)..................................14

*La. Pub. Serv. Comm'n v. FCC*,
    476 U.S. 355 (1986)......................................................................................16

*Leist v. Simplot*,
    638 F.2d 283, 322 (2d Cir. 1980)..........................................................15, 18, 19

*Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*,
    456 U.S. 353 (1982)................................................................................15, 16

*Morales v. Trans World Airlines, Inc.*,
    504 U.S. 374 (1992)................................................................................21, 22

*Nat'l Meat Ass'n v. Harris*,
    565 U.S. 452 (2012)......................................................................................21

*Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*,
    461 U.S. 190 (1983)......................................................................................12

*Register.com, Inc. v. Verio, Inc.*,
    356 F.3d 393 (2d Cir. 2004)..........................................................................23

*Rice v. Bd. of Trade of Chi.*,
    331 U.S. 247 (1947)......................................................................................15

*Rufo v. Inmates of Suffolk Cnty. Jail*,
  502 U.S. 367 (1992)..................................................................................25

*Succow v. Bondi*,
  No. 3:25-CV-250-SVN, 2025 WL 818622 (D. Conn. Mar. 14, 2025)..............................24, 25

*Tom Doherty Assocs., Inc. v. Saban Ent. Inc.*,
  60 F.3d 27 (2d Cir. 1995)...........................................................................24

*United States v. New York*,
  708 F.2d 92 (2nd Cir. 1983)........................................................................23

*Valle del Sol Inc. v. Whiting*,
  732 F.3d 1006 (9th Cir. 2013) .....................................................................22

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008)...................................................................................11

*Ex parte Young*,
  209 U.S. 123 (1908).................................................................................23

**Statutes**

7 U.S.C. § 1a .........................................................................................5

7 U.S.C. § 2 .................................................................................... *passim*

7 U.S.C. § 7 ......................................................................................4, 16

7 U.S.C. § 7a-2 ................................................................................ *passim*

7 U.S.C. § 8 ........................................................................................24

7 U.S.C. § 13a-2 ...................................................................................17

7 U.S.C. § 16 ...................................................................................13, 17

31 U.S.C. § 5362 ...............................................................................17, 18

Conn. Gen. Stat. § 12-850........................................................................8, 9

Conn. Gen. Stat. § 12-857........................................................................7, 8

Conn. Gen. Stat. § 12-863...............................................................8, 9, 20, 21

Conn. Gen. Stat. §§ 42-110 et seq. ..................................................................9

Conn. Gen. Stat. § 52-553...........................................................................9

iv

Conn. Gen. Stat. § 53-278a .................................................................................9

Conn. Gen. Stat. § 53-278b ...............................................................8, 10, 19, 20, 22

Conn. Gen. Stat. § 53-278d ...................................................................8, 10, 20, 22

**Other Authorities**

17 C.F.R. § 1.31 ...........................................................................................16

17 C.F.R. § 38.3 ............................................................................................4

17 C.F.R. § 38.5 ............................................................................................7

17 C.F.R. § 38.100 .......................................................................................16

17 C.F.R. § 38.150 .......................................................................................21

17 C.F.R. § 38.151 ...................................................................................21, 24

17 C.F.R. § 38.152 ........................................................................................7

17 C.F.R. § 38.250 ........................................................................................7

17 C.F.R. § 38.255 ...................................................................................21, 24

17 C.F.R. § 38.450 .......................................................................................16

17 C.F.R. § 38.950 .......................................................................................16

17 C.F.R.  § 38.1101 ....................................................................................16

17 C.F.R. § 40.2 .......................................................................................5, 16

17 C.F.R. § 40.11 ...................................................................................5, 6, 16

120 Cong. Rec. 30464 (1974) .......................................................................15

*Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on
    Agriculture & Forestry on S. 2485, S. 2578, S. 2837and H.R. 13113,* 93d
    Cong., 2d Sess. (1973) ..........................................................................3, 4, 14

Fed. R. Civ. P. 65(c) ....................................................................................25

H.R. Conf. Rep. No. 93-1383 (1974) ...........................................................4, 14

H.R. Rep. No. 93-975 (1974) ........................................................14, 16, 18, 19

H.R. Rep. No. 97-565, pt. 1 (1982) ...........................................................13, 17

Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent
    L. Rev. 657 (1982) ................................................................................13, 14, 15, 17

Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption
    as Public Policy*, 29 Vand. L. Rev. 1 (1976) .......................................................11

*Review of Commodity Exchange Act and Discussion of Possible Changes:
    Hearings Before the H. Comm. on Agriculture*, 93d Cong., 1st Sess. (1973) ......................3, 4

S. Rep. No. 93-1131 (1974) ................................................................................4, 15

## INTRODUCTION

Defendants Bryan T. Cafferelli, Kristopher Gilman, William Tong, and the Connecticut Department of Consumer Protection ("DCP") (together, "Defendants") are unconstitutionally threatening to prohibit trading of event contracts on Kalshi's designated contract market, even though those contracts are federally authorized and Kalshi is overseen by the Commodity Futures Trading Commission ("CFTC")—the federal agency that Congress endowed with "exclusive jurisdiction" to regulate trading on exchanges like Kalshi. The DCP's unlawful actions threaten Kalshi with criminal prosecution and civil enforcement unless Kalshi accedes to the DCP's unconstitutional demands. These threats violate the Commodity Exchange Act ("CEA") and subject Kalshi to irreparable harm that requires preliminary relief.

A federal district court in New Jersey has entered a preliminary injunction in Kalshi's favor based on similar threats from state regulators. *KalshiEX LLC v. Flaherty*, No. 25-cv-02152-ESK-MJS, 2025 WL 1218313 at *6 (D.N.J. Apr. 28, 2025). On April 28, 2025, the U.S. District Court for the District of New Jersey enjoined New Jersey gaming authorities from enforcing state law against Kalshi's event contracts. Judge Kiel explained that the court was "persuaded [] Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction" and "at the very least field preemption applies" to prevent states from regulating trading on DCMs like Kalshi. *Id.* at *6. The court further noted that Kalshi had already received a "similar cease-and-desist-letter" in another state—like the letter Defendants issued here—underscoring the "harms to [Kalshi's] reputation and goodwill" at stake in this case. *Id.* at *7. The court rejected the defense that Kalshi's contracts were "unlawful" under federal law, noting that even if that were true (it is not), "that would subject Kalshi to the review of the CFTC—not state regulators." *Id.* at *5.

The DCP is threatening Kalshi with criminal action and civil penalties unless it shuts down access to these contracts in Connecticut and allows all Connecticut residents to withdraw any funds currently held by Kalshi *immediately*. *See* Declaration of Andrew Porter ("Porter Decl.") Ex. 1 ("C&D Letter"), at 1-2. But just as in New Jersey, state authorities in Connecticut are preempted from attempting to regulate trading on a federally regulated exchange.

Immediate action is required to avoid irreparable harm to Kalshi and its users. The DCP's cease-and-desist letter confronts Kalshi with a "Hobson's choice"—denying an injunction "would mean leaving it subject to state enforcement or obligating it to shift its business practices, consequences that are not cleanly undone." *Flaherty*, 2025 WL 1218313, at *7. Kalshi respectfully requests that this Court issue a preliminary injunction enjoining Defendants from enforcing preempted state law against Kalshi.

*** 

Kalshi has no option but to seek judicial relief. The DCP's cease-and-desist letter demands that Kalshi immediately cease operating in Connecticut or face criminal and civil liability. Because its platform lists contracts to be traded continuously, Kalshi has no other practical choice to protect its commercial interests and those of its users except to bring this suit. Absent judicial relief, Kalshi faces the imminent prospect of criminal enforcement and civil penalties in Connecticut.

## **BACKGROUND**

### A. **The Exclusive Federal Scheme for Regulating Futures Markets on Regulated Exchanges.**

Derivative contracts are financial tools that traders use to mitigate risk. *See KalshiEX LLC v. CFTC*, No. 23-cv-3257 (JMC), 2024 WL 4164694, at *1-2 (D.D.C. Sep. 12, 2024). Event contracts are a type of derivative contract—they are financial instruments that identify a future

event with several possible outcomes, a payment schedule for the outcomes, and an expiration date. *See id.* at *2. Event contracts are typically traded on an exchange, and their value is determined by market forces. *See id.* This means that the price of an event contract fluctuates from the time of its creation to its expiration date in accordance with the changing likelihood of the event's occurrence, creating a uniquely sensitive financial instrument that tracks real-world market perceptions. *See id.* During the period of a contract, individuals can buy and sell the contract at its changing prices; no user is locked into a contract, and she may trade her contract in accordance with her desire to hedge her economic risk. Compl. ¶¶ 25-26, ECF No. 1. The ultimate value of an event contract is determined at its expiration date—most commonly, the event's occurrence or a set date upon which the contract terminates. *See KalshiEX*, 2024 WL 4164694, at *2. For example, a property owner on the Gulf Coast may place a position on whether a hurricane will strike the area around his property within the 2025 calendar year. *Id.* If a hurricane strikes, the property owner will receive the ultimate value of the contract and can thereby hedge risk by offsetting losses incurred due to the hurricane. *Id.*

Congress passed the CEA in 1936 to regulate derivatives exchanges but chose not to preempt state regulation of those exchanges. In 1974, Congress amended the CEA to establish the CFTC as the federal agency empowered to oversee and regulate exchanges under the CEA and to grant the CFTC "exclusive jurisdiction" to regulate trading on the exchanges it oversees. These amendments were designed to "[b]ring[] all futures trading under federal regulation." *Commodity Futures Trading Commission Act: Hearings Before the S. Comm. on Agriculture & Forestry on S. 2485, S. 2578, S. 2837, and H.R. 13113*, 93d Cong., 2d Sess. 848 (1974) (hereinafter Senate Hearings). Congress recognized that federal regulation would only be workable if it "prevent[ed] any possible conflicts over jurisdiction." *Review of Commodity Exchange Act and Discussion of*

*Possible Changes: Hearings Before the House Comm. on Agriculture*, 93d Cong., 1st Sess. 128 (1973). Subjecting exchanges to "different State laws would just lead to total chaos." Senate Hearings at 685 (statement of Sen. Clark).

Congress also deliberately reinforced the CFTC's exclusive jurisdiction. After House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "where the jurisdiction of the Commodity Futures Trading Commission is applicable, it supersedes State as well as Federal agencies." *Id.* at 23. The Senate also "struck" the existing CEA provision that preserved states' authority to regulate derivatives transactions. H.R. Conf. Rep. No. 93-1383, at 35. As the conference report explained, the amendments were designed to "preempt the field insofar as futures regulation is concerned." *Id.*

The CFTC's regulatory framework is extensive, comprehensive, and exclusive. To obtain approval from the CFTC, an exchange must first apply for and receive the CFTC's designation as a contract market. 7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.3(a). The exchange's application must detail its capacity to comply with all CFTC rules and regulations through a series of written submissions and exhibits. 17 C.F.R. § 38.3(a)(2). The CFTC then reviews the application and renders a decision on the exchange's designation. *Id.* § 38.3(a)(1).

Once the CFTC designates an entity as a contract market—known as a "DCM"—the CFTC has "exclusive jurisdiction" over derivatives traded on the market, including "accounts, agreements (including any transaction which is of the character of, or is commonly known to the trade as, an 'option', 'privilege', 'indemnity', 'bid', 'offer', 'put', 'call', 'advance guaranty', or 'decline guaranty'), and transactions involving swaps or contracts of sale of a commodity for

future delivery." 7 U.S.C. § 2(a)(1)(A). This exclusive jurisdiction extends to event contracts. *See id.* §§ 1a(47)(A)(ii), (iv), (vi).

DCMs are subject to the CFTC's extensive regulatory framework as set out in Part 38 of Title 17 of the U.S. Code and in CFTC regulations. Together, these provisions establish a comprehensive scheme for regulating DCMs. *See KalshiEX LLC v. Flaherty*, 2025 WL 1218313, at *1-2 (summarizing CFTC's regulatory scheme).

The CEA prescribes a specific method by which the CFTC may approve new contracts on DCMs. A DCM that abides by the requirements set forth in the CEA may list contracts on its exchange without pre-approval from the CFTC by self-certifying that the contracts comply with CFTC requirements. 7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a). The contracts are effective on the date 10 business days after the Commission receives the certification unless and until the CFTC initiates review of any contract. *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c). The CFTC "shall approve a new contract" unless the CFTC finds that it would violate the CEA or CFTC regulations. 7 U.S.C. § 7a-2(c)(5)(B). If a DCM offers a contract in violation of the CEA or CFTC regulations, the CFTC has an array of enforcement mechanisms, including but not limited to revocation of licensing, civil penalties, and criminal enforcement.

In 2010, Congress amended the CEA to add a "Special Rule" specifically addressing event contracts. The Special Rule authorizes the CFTC to review and prohibit specific types of event contracts that it determines to be "contrary to the public interest." 7 U.S.C. § 7a-2(c)(5)(C)(i). The CEA specifically authorizes the CFTC to reject event contracts if the Commission deems them to be "contrary to the public interest" and if they "involve" an "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.*;

5

*see also* 17 C.F.R. § 40.11(a) (implementing Special Rule).  The decision to prohibit an event

contract that falls within any of these categories is subject to the CFTC's evaluation of the "public

interest."  *See KalshiEX*, 2024 WL 4164694, at *3 ("the CFTC may determine that an agreement,

contract, or transaction is contrary to the public interest only if it involves" one of the enumerated

categories).  The Special Rule further provides that no contract "determined by the Commission

to be contrary to the public interest . . . may be listed or made available for clearing or trading on

or through a registered entity."  7 U.S.C. § 7a-2(c)(5)(C)(ii).

**B.  Kalshi's Registration as a CFTC-Designated Contract Market Under Federal Law.**

In 2020, the CFTC certified Kalshi as a DCM that offers event contracts, affirming that its

platform complies with the CEA's regulatory requirements.  *KalshiEX*, 2024 WL 4164694, at *4.

Because Kalshi is a DCM, its event contracts are subject to the "exclusive jurisdiction" of the

CFTC.  7 U.S.C. § 2(a)(1)(A).  Federal law requires Kalshi to comply with a host of federal

requirements designed to ensure market integrity.  An exchange's status as a DCM "imposes upon

it a duty of self-regulation, subject to the Commission's oversight," requiring the exchange to

"enact and enforce rules to ensure fair and orderly trading, including rules designed to prevent

price manipulation, cornering and other market disturbances."  *Am. Agric. Movement, Inc. v. Bd.*

*of Trade of Chi.*, 977 F.2d 1147, 1150-51 (7th Cir. 1992).

Kalshi offers many kinds of event contracts related to climate, technology, health, crypto,

popular culture, sports, politics, and economics.  Compl. ¶ 42-43.  For example, Kalshi's platform

currently allows users to trade on whether India will meet its 2030 climate goals, or whether the

market share for electric vehicles will be above 50% in 2030.  *Id.*  Kalshi also offers sports-event

contracts.  *Id.* ¶ 43.  Kalshi self-certified and listed sports-related contracts on its exchange on

January 22, 2025, allowing users to place positions on, for example, which teams will advance in

certain rounds of the NCAA College Basketball Championship or who will win the U.S. Open Golf Tournament. *Id.* Shortly after Kalshi self-certified its first sports-event contracts, the CFTC requested that Kalshi submit a demonstration of compliance with the CEA pursuant to 17 C.F.R. § 38.5(b). *Id.* Kalshi responded with lengthy memoranda detailing the listing's compliance with applicable rules and regulations, and the CFTC's jurisdiction over sports-event contracts traded on DCMs. *Id.* The CFTC took no further action and has since allowed thousands of Kalshi's sports-event contracts to be listed, traded, and closed, with no hint that the agency views these contracts as falling outside of its jurisdiction. *Id.* Unless and until the CFTC takes action on Kalshi's sports-event contracts—all of which have been self-certified under the CEA—they are authorized under federal law. 7 U.S.C. § 7a-2(c)(5).

Kalshi's sports-related contracts involve sporting events, but there are crucial differences between Kalshi's exchange and a sportsbook that justify the different regulatory models under which they function. A financial exchange is an investment marketplace where traders enter into contracts with other traders—not with a casino or "house" that stacks the odds in its own favor. Declaration of Xavier Sottile ("Sottile Decl.") ¶¶ 26-27. For that reason, federal law as enforced by the CFTC focuses on preventing market manipulation and disruption and ensuring market efficiency nationwide. *See* 17 C.F.R. §§ 38.250, 38.152; *Am. Agric. Movement*, 977 F.2d at 1156.

### C. The Connecticut Regulatory Scheme for Gaming.

The Gaming Division of the Connecticut DCP regulates gaming in the state of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gaming, and by monitoring and educating to ensure compliance with the state's gaming laws. Compl. ¶ 20. Particularly relevant to the present dispute are Connecticut's laws on licensing and regulation of online casino gaming and sports wagering. Connecticut requires that any online gaming operator

seek a license from the DCP.  Conn. Gen. Stat. § 12-857(a).  Under Connecticut law, an "online gaming operator" includes entities that operate an "electronic wagering platform" to offer "Internet games" (which are defined to include "online sports wagering").  Conn. Gen. Stat. §§ 12-850(27), 12-850(13).  Sports wagering is defined as "[r]isking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform; and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event; or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events."  Conn. Gen. Stat. § 12-850(34).  Connecticut law only permits sports wagers outside of tribal reservations to be made by individuals through a licensed retail sports wagering facility or a licensed online sports wagering platform.  Conn. Gen. Stat. § 12-863.  Offering gaming in Connecticut in a manner that violates the state's gaming laws can constitute a class A or class B misdemeanor, exposing any violators to civil and criminal penalties.  Conn. Gen. Stat. §§ 53-278b, 53-278d.

### D.  The Department of Consumer Protection's Cease-and-Desist Letter to Kalshi.

On the afternoon of December 2, 2025, the DCP sent Kalshi an email containing a cease-and-desist letter claiming that it was "conducting unlicensed online gambling, more specifically sports wagering" by offering its contracts in Connecticut in violation of state law.  Porter Decl. Ex. 1 (C&D Letter), at 1.  The letter directed Kalshi to "immediately cease and desist advertising and offering its Contracts to Connecticut residents."  *Id.*

The DCP claimed that Kalshi's contracts "constitute sports wagering because they allow Connecticut residents to risk something of value for gain by an electronic wagering platform through the placement of wagers on the outcome of live sporting events or portions of a live

sporting event including future events." *Id.* (citing Conn. Gen. Stat. § 12-850(34)).  The DCP added that "[e]ven if Kalshi possessed an online gaming operator's license, Kalshi's contracts still violate numerous other Connecticut laws and public policies" that bar individuals under 21 from placing wagers and prohibit wagers involving Connecticut intercollegiate sports teams.  *Id.* at 2 (citing Conn. Gen. Stat. §§ 12-863(a)(1) and 12-850(30)).  The DCP further contended that Kalshi's contracts are "void" under state law prohibiting wagering contracts.  *Id.* (citing Conn. Gen. Stat. § 52-553).  The DCP also claimed that Kalshi's "promotion of unlicensed and illegal gambling services is also an unfair trade practice" in violation of the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. §§ 42-110 et seq. ("CUTPA") because they are "deceptive" and "unfair" as Kalshi "is able to gain a competitive advantage over appropriately licensed entities" by "operating outside of the regulatory environment."  *Id.*

DCP's cease-and-desist letter did not limit itself to Kalshi's sports-event contracts, but rather suggested that *all* of Kalshi's event contracts are unlawful because Connecticut law "prohibits gambling," defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device," and Kalshi's actions do not "fall within any of the excepted activities to the prohibition on gambling." *Id.* at 1-2 (quoting Conn. Gen. Stat. § 53-278a).  The DCP's theory is that *all* event contracts amount to unlawful gambling, even though the CEA clearly authorizes event contracts and subjects them to the CFTC's exclusive jurisdiction.

The DCP ordered Kalshi to "immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents."  *Id.* at 2.  Finally, the DCP warned that "[f]ailure to comply may result in

additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d." *Id.* at 2.

Although Kalshi engaged in a constructive, good faith dialogue with the DCP regarding the claims in the C&D Letter[1]—the C&D Letter's sudden demand of immediate compliance, in lieu of continued engagement, left Kalshi with no choice but file a complaint seeking declaratory and injunctive relief.

Shortly after filing the Complaint in this action, Kalshi informed the DCP of Kalshi's suit, provided the DCP a copy of the Complaint, and noted that Kalshi intended to seek preliminary relief. Porter Decl. Ex. 2. Counsel for Kalshi also requested that the DCP forbear any enforcement against Kalshi pending the resolution of Kalshi's suit, or at minimum, this Court's consideration of Kalshi's motion for preliminary injunction. *Id.* On December 4, the parties met and conferred to discuss the C&D Letter, the Complaint in this case, and Kalshi's intention to seek preliminary relief. During this call, counsel for Defendants confirmed that the state would not commit to non-enforcement during the pendency of the litigation. *See* Porter Decl. ¶ 7. However, Defendants have agreed to refrain from taking enforcement action against Kalshi with respect to any conduct described in the C&D Letter during the Court's disposition of this motion. ECF No. 11 at 1.

Kalshi respectfully requests that this Court enter a preliminary injunction.

---

[1] Six months before receiving the DCP's cease-and-desist letter, on May 12, 2025, counsel for Kalshi met with representatives from the DCP and the Consumer Protection Section of the Connecticut Attorney General's Office ("AGO") to discuss Kalshi's operations and the federal regulatory scheme for DCMs. Porter Decl. ¶ 2. During that discussion, the DCP and AGO requested that Kalshi provide answers to certain questions they had about Kalshi's platform, federal commodities laws, and protections for traders. Kalshi sent its written response to AGO and the DCP on May 30, 2025. *Id.* at ¶ 3. Kalshi received no subsequent inquiries or updates from AGO or the DCP. *Id.* at ¶ 4.

**ARGUMENT**

Federal Rule of Civil Procedure 65 governs the issuance of a preliminary injunction. *Cerilli v. Quiros*, No. 24-cv-1163 (VDO), 2025 WL 47536, at *2 (D. Conn. Jan. 8, 2025). To obtain such relief, the moving party must demonstrate that: (1) it is likely to succeed on the merits; (2) it is likely to suffer irreparable harm in the absence of relief; (3) the balance of equities tips in its favor; and (4) the injunction is in the public interest. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). For the same reasons the District of New Jersey granted Kalshi a preliminary injunction in a similar case, Kalshi satisfies each element of the inquiry.

## A. Kalshi Is Likely to Succeed Because Connecticut's Efforts to Regulate Kalshi's Event Contracts Are Preempted by the CEA and Its Regulations.

A "fundamental principle of the Constitution" is that "Congress has the power to preempt state law." *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 372 (2000). Federal law can preempt state law either expressly or impliedly. One manner of preemption is known as field preemption, which occurs where Congress manifests an intent to exclusively occupy an entire field of regulation. *Fid. Fed. Sav. & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 153 (1982). Alternatively, federal law can preempt state law where compliance with both is impossible or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," known as conflict preemption. *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). It is well-settled that the CEA and its implementing regulations have "resulted in the preemption of all other would-be regulators at every level of government." Philip F. Johnson, *The Commodity Futures Trading Commission Act: Preemption as Public Policy*, 29 Vand. L. Rev. 1, 2 (1976). Connecticut's gambling laws are no exception.

1. **Connecticut Gambling Laws Are Field Preempted as Applied to Kalshi's Event Contracts.**

Field preemption exists where a federal regulatory scheme is "so pervasive as to make reasonable the inference that [it] left no room for the States to supplement it." *de la Cuesta*, 458 U.S. at 153 (citation modified). Field preemption can be either express or implied. *See Crosby*, 530 U.S. at 372 n.6 (the preemption "categories" "are not 'rigidly distinct,'" and "'field' preemption may fall into any of the categories of express, implied, or conflict preemption"). Congress's intent to occupy a field can be apparent in the statutory text and history. *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 203-13 (1983). Courts can also infer field preemption from a scheme of "federal statutory directives" that "provide a full set of standards . . . designed [to function] as a 'harmonious whole.'" *Arizona v. United States*, 567 U.S. 387, 401 (2012) (quoting *Hines*, 312 U.S. at 72). "Where Congress occupies an entire field . . . even *complementary* state regulation is impermissible." *Id.* (emphasis added).

Congress has preempted the field of regulating trading on DCMs, both expressly in the text of the CEA and implicitly by creating a comprehensive structure for regulating DCMs that leaves no room for state regulation. Every marker of congressional intent confirms that Congress has preempted the field.

<u>*Statutory Text*</u>: The text of the 1974 amendments to the CEA could hardly be clearer. Congress established the CFTC and granted it "*exclusive jurisdiction*" over all "accounts," "agreements," and "transactions involving swaps or contracts of sale of a commodity for future delivery" that are "traded or executed on a contract market designated" by the CFTC. 7 U.S.C. § 2(a)(1)(A) (emphasis added). Kalshi's event contracts are traded on a contract market designated by the CFTC, and the CFTC therefore has "exclusive jurisdiction" to regulate these contracts.

Congress in the 1974 Act did not preempt regulation of *all* derivatives contracts. Instead, Congress cabined federal preemption to contracts traded *on DCMs*. The statute preserves concurrent state regulation for commodities and futures contracts traded *outside of DCMs*. 7 U.S.C. §§ 2(a), 16(e); H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (acknowledging that federal and state agencies may police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC") (emphasis added). Thus, federal preemption of the Connecticut law as to Kalshi does not call into question the state's regulation of casinos or other gambling establishments, none of which are DCMs.

For CFTC-designated exchanges like Kalshi, however, the CFTC has "exclusive jurisdiction." 7 U.S.C. 2(a)(1)(A). Courts have easily found that statutes containing similar language preempt parallel state law regulation. *See City of New York v. Permanent Mission of India to U.N.*, 618 F.3d 172, 187 (2d Cir. 2010) ("A federal agency 'may preempt state regulation and hence render unenforceable state or local laws that are otherwise not inconsistent with federal law' provided the agency is 'acting within the scope of its congressionally delegated authority.'"). The U.S. District Court for the District of New Jersey recently granted Kalshi a preliminary injunction on the ground that "Kalshi's sports-related event contracts fall within the CFTC's exclusive jurisdiction." *Flaherty*, 2025 WL 1218313, at *6. The CFTC itself agrees. It recently informed the D.C. Circuit that, "*due to federal preemption*, event contracts *never violate state law* when they are traded on a DCM" like Kalshi. Appellant Br. *27, *KalshiEx LLC v. CFTC*, 119 F.4th 48 (D.C. Cir. 2024) (emphases added). Commentators have likewise concluded with no difficulty that "the CEA preempts state bucket-shop laws and other anti-gambling legislation" as

13

applied to trading on DCMs.  Kevin T. Van Wart, *Preemption and the Commodity Exchange Act*, 58 Chi.-Kent L. Rev. 657, 721 (1982).[2]

*Statutory Purpose*:  Congress in the 1974 Act sought to prevent exchanges from being subjected to fragmented regulatory demands that could differ from one jurisdiction to the next.  One "aim" of the 1974 Act was to "avoid unnecessary, overlapping and duplicative regulation."  *FTC v. Ken Roberts Co.*, 276 F.3d 583, 588 (D.C. Cir. 2001).  As one sponsor of the 1974 Act explained, "different State laws would just lead to total chaos."  Senate Hearings at 685 (statement of Sen. Clark).

Congress thus placed "all exchanges and all persons in the industry under the same set of rules and regulations for the protection of all concerned."  H.R. Rep. No. 93-975, at 82 (1974).  The Conference Report confirmed Congress's intent to preempt the field:  "Under the exclusive grant of jurisdiction to the Commission, the authority in the Commodity Exchange Act (and the regulations issued by the Commission) *would preempt the field insofar as futures regulation is concerned*."  H.R. Conf. Rep. No. 93-1383 at 35 (emphasis added).

Courts agree that Congress intended to preclude states from exercising parallel authority over commodity futures trading in exchanges designated by the CFTC.  Writing for the Second

---

[2] A district court in Maryland reached a different conclusion, but Kalshi has appealed that decision to the Fourth Circuit, and the defendants have agreed to refrain from any enforcement action against Kalshi while the issue is appealed.  *See KalshiEX LLC v. Martin*, No. 25-cv-1283-ABA, 793 F. Supp. 3d 667, 671 (D. Md. 2025), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025).  Additionally, a district court in Nevada recently dissolved a preliminary injunction it had previously granted to Kalshi.  The Nevada court did not dispute that the CEA preempts state gaming law as applied to trading swaps and futures contracts on DCMs, but instead concluded that Kalshi's sports-event contracts do not qualify as swaps or futures subject to CFTC jurisdiction.  *See KalshiEX, LLC v. Hendrick*, No. 2:25-cv-00575-APG-BNW, 2025 WL 3286282, at *14 (D. Nev. Nov. 24, 2025).  That conclusion was mistaken and conflicts with the CFTC's clear exercise of jurisdiction over Kalshi's contracts.  Kalshi has appealed that decision to the Ninth Circuit, and briefing on a stay pending appeal is now underway.  *See KalshiEX, LLC v. Hendrick*, No. 25-7516 (9th Cir. Nov. 28, 2025).

Circuit, for example, Judge Friendly explained that the CEA "preempts the application of state law" regarding trading on federal exchanges. *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980), *aff'd sub nom. Merrill Lynch, Pierce, Fenner & Smith, Inc. v. Curran*, 456 U.S. 353 (1982); *see also Int'l Trading, Ltd. v. Bell*, 556 S.W.2d 420, 424 (Ark. 1977) (exclusive jurisdiction clause "is a clear indication that Congress intended no regulation in this field except under the authority of the act"). The DCP's effort to regulate Kalshi's event contracts cannot be reconciled with that clear congressional purpose.

*Drafting history*: The drafting history of the 1974 Act eliminates all doubt as to Congress's intent to preempt state laws like those Defendants have threatened to enforce against Kalshi. To "assure that Federal preemption is complete," the Senate deleted the provision the Supreme Court had previously interpreted to preserve the states' authority over futures trading. 120 Cong. Rec. 30464 (1974) (statement of Sen. Curtis); *see Rice v. Bd. of Trade of Chi.*, 331 U.S. 247, 255 (1947). And after House drafters introduced a state-law savings clause, the Senate added language making clear that the clause applied "except as hereinabove provided" in the grant of exclusive jurisdiction to the CFTC. S. Rep. No. 93-1131, at 31 (1974). The language ensured that "the Commission's jurisdiction, where applicable supersedes State as well as Federal agencies." *Id.* at 23. These changes "wholly and unequivocally eliminated each of the bases" the Supreme Court had previously relied on "to hold that the CEA did not preempt state regulation." Van Wart, *supra*, at 692-93. "Few principles of statutory construction are more compelling than the proposition that Congress does not intend *sub silentio* to enact statutory language that it has earlier discarded in favor of other language." *INS v. Cardoza-Fonseca*, 480 U.S. 421, 442-43 (1987). The Senate's decision to omit provisions allowing concurrent state jurisdiction over trading on DCMs is yet further proof of Congress's intent to preempt parallel state regulation.

15

*Comprehensive regulatory scheme*:  The comprehensive nature of the regulatory scheme Congress created for CFTC-authorized exchanges is further evidence that Congress intended to foreclose concurrent state jurisdiction.  *See Arizona*, 567 U.S. at 401; *La. Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 368-69 (1986).

As the Supreme Court has found, the CEA establishes "a comprehensive regulatory structure to oversee the volatile and esoteric futures trading complex."  *Merrill Lynch,* 456 U.S. at 356 (quoting H.R. Rep. No. 93-975, at 1 (1974)).  An exchange may only offer futures contracts after undergoing an extensive review process and receiving the CFTC's designation as a DCM.  7 U.S.C. §§ 2(e), 7(a); 17 C.F.R. § 38.100.  Once an exchange is designated as a DCM, the CFTC enjoys "exclusive jurisdiction" over the derivatives traded on the market.  7 U.S.C. § 2(a)(1)(A). DCMs are subject to an extensive framework of CFTC oversight, involving recordkeeping requirements, 17 C.F.R. §§ 38.950, 1.31, reporting obligations, *id.* § 38.450, pt. 16, liquidity standards, *id.* § 38.1101(a)(2), and penalties for noncompliance, *id.* pt. 38.  And Congress elected to allow DCMs to list contracts—including event contracts—by self-certifying that they comply with the CEA's requirements.  7 U.S.C. § 7a-2(c)(1); 17 C.F.R. § 40.2(a)(3)(iv).  Congress then gave the CFTC the back-end authority to conduct a review of a contract if it believes the contract may run afoul of any statute or regulation.  *See* 7 U.S.C. § 7a-2(c)(2); 17 C.F.R. § 40.11(c).  Failure to abide by the CFTC's contract determinations can result in civil and criminal penalties, which the CFTC may pursue at its discretion.

Of particular relevance here, the CEA's Special Rule specifically authorizes the CFTC to reject certain event contracts deemed to be "contrary to the public interest" ***and*** "involv[ing]" certain types of activities.  7 U.S.C. § 7a-2(c)(5)(C)(i).  The Special Rule is not mandatory—the CFTC "may" prohibit a contract involving a listed activity ***or*** it may determine that such a contract

16

would not be contrary to the public interest.  *Id.*  Congress thus left the decision about the public interest to one federal authority—not 50 separate states and the District of Columbia.  *See Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-06162, 2025 WL 3141202, at *7 (N.D. Cal. Nov. 10, 2025) (because the CFTC has "exclusive jurisdiction," "the only enforcement mechanism belongs to the [CFTC]").

Congress dictated an enforcement role for states—but that role expressly *excludes* the right to enforce state laws against DCMs.  The CEA authorizes appropriate officials "of any State" to bring suit regarding "any act or practice constituting a violation of any provision of this chapter or any rule, regulation, or order of the [CFTC] thereunder"—but a proviso to this provision allows states to enforce the CEA against parties "*other than a [designated] contract market*."  7 U.S.C. § 13a-2(1) (emphasis added).  Congress added this proviso because it "wanted the power to enforce the CEA *with respect to organized exchanges* to remain solely in the CFTC."  Van Wart, *supra* at 708.  Congress further made clear that the CEA does not "supersede or preempt" the application of state law to entities that are "required to be registered or designated" with the CFTC but "fail or refuse" to do so.  7 U.S.C. § 16(e)(1)(C).  In other words, Congress granted the CFTC exclusive power to regulate contracts traded on the exchanges it oversees but permitted federal and state agencies to police "those who offer fraudulent *off-exchange* investments" and other "transactions *outside* those preserved exclusively for the jurisdiction of the CFTC."  H.R. Rep. No. 97-565, pt. 1, at 44 (1982) (emphasis added).  This comprehensive regulatory scheme for regulating trading on licensed exchanges evinces a strong congressional intent to preempt the field.

Other federal laws reinforce this intent.  The Unlawful Internet Gaming Enforcement Act of 2006 ("UIGEA"), generally prohibits use of the internet to transmit wagers between states "where such bet or wager is unlawful," 31 U.S.C. § 5362(10)(A), but provides that the term "bet

or wager" "*does not include*" transactions conducted on "a registered entity . . . under the Commodity Exchange Act," *id.* § 5362(1)(E) (emphasis added). UIGEA underscores Congress's understanding that, under the CEA, state gambling laws do not reach trading on DCMs. *See Blue Lake Rancheria*, 2025 WL 3141202, at *6 (Kalshi's "internet contracts are not bets or wagers under the UIGEA and therefore do not constitute 'unlawful internet gambling' even if the contracts are received, placed or transmitted from persons" where gambling is unlawful under local law).

### 2. <u>Connecticut Laws Are Conflict-Preempted as Applied to Kalshi</u>.

Connecticut's gambling laws are also conflict-preempted as applied to Kalshi because it would be "impossible" for Kalshi "to comply with both state and federal law," and because Connecticut's laws stand "as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in the CEA. *Crosby*, 530 U.S. at 372-73. In at least three respects, subjecting Kalshi's event contracts to Connecticut law would conflict with the CEA.

<u>*First*</u>, Congress passed the 1974 Amendments to the CEA to bring futures markets regulation "under a uniform set of regulations." *Am. Agric. Movement,* 977 F.2d at 1156; *see also Leist*, 638 F.2d at 295-96. "As Congress recognized in enacting the 1974 Act, a contract market could not operate efficiently, and perhaps not at all, if varying and potentially contradictory legal standards governed its duties to investors." *Am. Agric. Movement,* 977 F.2d at 1156. The Seventh Circuit found that "[w]hen application of state law would directly affect trading on or the operation of a futures market, it would stand 'as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress,' and hence is preempted." *Id.* at 1156-57 (citation modified).

In *Leist*, the Second Circuit held that the CEA preempts state law. As Judge Friendly explained for the court, the purpose of the CEA's exclusive jurisdiction clause was to "separate the functions of the new CFTC from those of the SEC and other regulators" bringing "[a]ll

commodities trading in futures [] within federal regulation under the aegis of the new [CFTC]." 638 F.2d at 314 (citing H.R. Rep. No. 93-975, pt. 1, at 3 (1974)).  In a decision later endorsed by the Supreme Court in *Curran*, the court in *Leist* held that that 1974 amendments to the CEA preserved a private cause of action.  The private-right-of-action analysis required the court to address whether the cause of action was one "traditionally relegated to state law, so that it would be inappropriate to infer a cause of action based solely on federal law."  *Id.* at 322.  The court found that the analysis of such a question needed "little space," because the "federal government has been vitally concerned with trading in futures since 1922; indeed, the courts have held that [Section] 2(a)(1) of the CEA preempts the application of state law."  *Id.*

Defendants' actions clearly conflict with Congress's goal to avoid subjecting regulated exchanges to multiple conflicting legal regimes.  Defendants intend to deploy state laws to regulate Kalshi's DCM—exactly what Congress did not want states to regulate.  Although the C&D Letter highlights Kalshi's sport-event contracts, Defendants' description of Connecticut law would mean that *all* of Kalshi's contracts are unlawful gambling under state law.  *See* C&D Letter at 1 (citing Conn. Gen. Stat. § 53-278b).  The application of these sorts of state laws is the precise outcome Congress sought to avoid in 1974, and the conflict is made even clearer when considering the possibility that 49 other states and the District of Columbia might equally attempt to subject Kalshi to their own varying state laws (as several have).  That state-by-state regulation would erect "an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines,* 312 U.S. at 67.

*Second*, a state law stands as an "obstacle" to a federal regulatory scheme if Congress chooses a specific enforcement method to achieve federal goals and a state law hampers "the careful balance struck by Congress."  *Arizona*, 567 U.S. at 406.  Where Congress "entrust[s]" the

federal government with "discretion" over violations of federal law, a state regime that allows for state prosecutions of the same actions is "preempted by federal law." *Id.* at 407-10. Otherwise, a state could bring charges "even in circumstances where federal officials in charge of the comprehensive scheme determine that prosecution would frustrate federal policies." *Id.* at 402.

That is exactly the risk posed by Defendants' actions. Under federal law, once Kalshi was approved as a CFTC-designated contract market, Kalshi was authorized to list its event contracts by self-certifying that these contracts comported with federal law. The CFTC had the authority to review that self-certification on the ground that these contracts were "contrary to the public interest," 7 U.S.C. § 7a-2(c)(5)(C)(i), but chose not to do so. Compl. ¶ 60. The CFTC's Enforcement Division has authority to investigate and initiate enforcement actions seeking an array of penalties in federal court or administrative proceedings, but, again, chose not to do so. Congress gave the CFTC numerous tools for enforcing federal law against DCMs and entrusted the CFTC with discretion to pursue the penalties it deems most appropriate.

Subjecting federally regulated exchanges to state laws like Connecticut's would disrupt "the congressional calibration of force." *Crosby*, 530 U.S. at 380. Connecticut criminal law imposes penalties that would substantially interfere with the CFTC's discretion. For example, Connecticut authorities threatened Kalshi with violations of statutes that carry penalties of fines and *imprisonment*. *See, e.g.*, Conn. Gen. Stat. §§ 53-278b and 53-278d. Absent a finding of preemption, the carefully calibrated federal enforcement scheme would be displaced by a blunt application of mandatory state criminal penalties.

*Third*, it is impossible for Kalshi to comply with the DCP's demands while continuing to adhere to the Core Principles on which Kalshi's designation as a CFTC-approved market depends. To secure a license in Connecticut, Kalshi would need to limit access to the exchange solely to

persons making trades in Connecticut.  *See* Conn. Gen. Stat. §12-863 (requiring that operators verify that the user "is twenty-one years of age or older and is physically present in the state when placing a wager").  But the requirement to accept trades only within one state would be impossible for a nationwide exchange like Kalshi required by federal law to "provide its members, persons with trading privileges, and independent software vendors with *impartial access* to its markets and services."  17 C.F.R. § 38.151(b) (emphasis added); *see also id.* § 38.150.  Attempting to comply with Connecticut's scheme would therefore present Kalshi with an impossible choice—either to accept trades exclusively from persons within Connecticut or to close its exchange to Connecticut in violation of its impartial access obligations.  And subjecting Kalshi to state law would mean that 49 other states would be free to subject Kalshi to the same impossible choice, resulting in precisely the state-by-state patchwork that Congress in 1974 sought to avoid.  This is a classic example of impossibility preemption—where federal law "forbids what the state law requires." *Nat'l Meat Ass'n v. Harris*, 565 U.S. 452, 460 (2012).[3]

## B.  Kalshi Will Suffer Irreparable Harm Without a Preliminary Injunction.

The DCP's cease-and-desist letter threatens Kalshi with a classic "Hobson's choice" giving rise to irreparable harm—either "continually violate [state] law and expose [itself] to potentially huge liability," or "suffer the injury of obeying the law during the pendency of the proceedings and any further review." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  As the

---

[3] Even if Kalshi could somehow exclude Connecticut residents from participating in its exchange, CFTC's Core Principle 4 requires Kalshi to "establish and maintain risk control mechanisms to prevent and reduce the potential risk of *price distortions and market disruptions*."  17 C.F.R. § 38.255 (emphasis added).  Abruptly closing Kalshi's event contracts to anyone located in Connecticut as a result of the DCP's threats of criminal liability would constitute exactly that sort of market disruption.

district court in New Jersey recognized in similar circumstances, Kalshi suffers irreparable harm along several dimensions. *Flaherty*, 2025 WL 1218313, at *6.

_First_, if Kalshi chooses not to comply with the DCP's unconstitutional threats, Kalshi and its officers face the extraordinary harms associated with the threat of civil liability and criminal prosecution. The Supreme Court has recognized that a party facing the threat of imminent enforcement under a preempted state statute suffers irreparable injury. *Morales*, 504 U.S. at 381. The Second Circuit agrees that there is a "presumption of irreparable injury that flows from a violation of constitutional rights" and that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm." *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996); *see also Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) ("credible threat of prosecution" under a preempted state statute amounts to irreparable harm). The DCP stated that it "may" pursue "additional action including, but not limited to, civil penalties under CUTPA and/or criminal penalties under Conn. Gen. Stat. §§ 53-278b and 53-278d" if Kalshi fails to "immediately cease and desist advertising, offering, promoting, or otherwise making available Contracts or any other form of unlicensed online gambling to Connecticut residents." Porter Decl. Ex. 1, at 2.

_Second_, attempting to comply with the DCP's unconstitutional threat would subject Kalshi to extensive harms that could not be remedied even if it ultimately prevailed in this litigation. Kalshi has over 24,000 users in Connecticut, with millions of dollars in open investments on the platform. Sottile Decl. ¶ 24. If Kalshi complied with the DCP's unconstitutional threat during the pendency of this litigation, it would forgo business in this market, with no prospect of recouping its losses even if it ultimately prevails. Moreover, it is not at all clear that Kalshi has the capacity to comply with the threat to cease "immediately" as the DCP demands, and any attempt at complying would subject Kalshi to extraordinary technological challenges and costs. Kalshi has

no need currently to comprehensively geolocate its users on a state-by-state basis because it is regulated federally. *Id.* ¶ 18. Attempting to implement geolocation capabilities would take months and cost tens of millions of dollars annually. *Id.* ¶¶ 21-22. And because the Eleventh Amendment permits only *injunctive relief* against state officials enforcing unconstitutional state law, *see Ex parte Young*, 209 U.S. 123, 155 (1908); *Ford v. Reynolds*, 316 F.3d 351, 354-55 (2d Cir. 2003), Kalshi would have no clear way of seeking damages if it ultimately prevailed. *See Am. Fin. Servs. Ass'n v. Burke*, 169 F. Supp. 2d 62, 70 (D. Conn. 2001) ("Where pecuniary losses cannot later be recovered because the defendant enjoys Eleventh Amendment immunity (as the State of Connecticut does here), such losses are irreparable for purposes of preliminary injunctive relief."); *United States v. New York*, 708 F.2d 92, 93 (2nd Cir. 1983) (holding irreparable harm established where an action to recover damages would be barred by the Eleventh Amendment); *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (monetary harm "is irreparable here because [plaintiffs] will not be able to recover monetary damages" due to damages immunity).

*Third*, a preliminary injunction is needed not just to protect Kalshi, but also Kalshi's users. Users who trade on Kalshi's platform enter into contracts with other users. Immediately shuttering access to these contracts for Connecticut users could require Kalshi unilaterally to terminate users' contracts and liquidate their positions, or to pause trading on these contracts pending the outcome of litigation months or more in the future. Sottile Decl. ¶¶ 29-37. Under either scenario, this would be an extraordinary and disruptive act, harming users not just in Connecticut but nationwide, because cutting off access to users in one state would substantially distort the markets even for users in other states. Such an impairment of existing contractual obligations for Kalshi's users easily constitutes irreparable harm. *See Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 404 (2d

23

Cir. 2004) (company's "loss of reputation, good will, and business opportunities" from a breach of contract can constitute irreparable harm).

_Fourth_, Kalshi will face irreparable reputational harm if no injunction is granted.  If Kalshi chooses not to comply on the ground that Connecticut law is preempted, the threat of prosecution—not to mention being labelled a willful violator of Connecticut law—would undermine the reputation that Kalshi has cultivated over many years and that resulted in Kalshi being the first event market designated by the CFTC.  But bowing to the DCP's threat by abruptly ending its business in Connecticut would undermine users' confidence in Kalshi's exchange and make them fear that their own investments are at risk.  *See* Sottile Decl. ¶¶ 34, 47.  This loss of "goodwill" could not easily be regained even if Kalshi ultimately prevails and constitutes a distinct form of irreparable harm.  *Tom Doherty Assocs., Inc. v. Saban Ent. Inc.*, 60 F.3d 27, 37 (2d Cir. 1995).  Moreover, the DCP's demands jeopardize Kalshi's status as a CFTC-designated contract market—and thus pose an existential threat to Kalshi.  Abruptly terminating its event-based contracts in Connecticut would risk violating the CFTC Core Principles to which Kalshi is subject, including the obligation to provide "impartial access" to its markets, 17 C.F.R. § 38.151(b), and the obligation to reduce the risk of "market disruptions," *id.* § 38.255.  Should the CFTC conclude that closing Kalshi's markets in Connecticut violates federal law, it could respond by seeking to revoke Kalshi's designation.  7 U.S.C. § 8(b).  A preliminary injunction is needed to prevent Kalshi from suffering irreparable harm during the pendency of this litigation.

## C. The Balance of the Equities and Public Interest Favor a Preliminary Injunction.

The public has a first-order interest in ensuring that preempted Connecticut laws are not enforced against federally regulated entities.  Enjoining the unconstitutional application of a statute serves the public interest because "the public interest disfavors the enforcement of unconstitutional

laws[.]"  *Succow v. Bondi*, No. 3:25-CV-250-SVN, 2025 WL 818622, at *5 (D. Conn. Mar. 14,

2025).  By the same token, Defendants cannot show any harm as a result of being prevented from

enforcing a statute until after a determination of its constitutionality.  *See Anderson v. Vaughn*, 333

F. Supp. 703, 705 (D. Conn. 1970).  The New Jersey court that addressed this question in related

litigation accordingly found that enjoining a preempted law comports with the public interest.

*Flaherty*, 2025 WL 1218313, at *7.  Connecticut retains no reciprocal interest because it lacks any

interest in enforcing a state law that is preempted.  *See Arizona*, 567 U.S. at 401.

Beyond that, the failure to issue an injunction here would "reach beyond the parties

involved directly in the suit and impact . . . the public's right[s]."  *Rufo v. Inmates of Suffolk Cnty.

Jail*, 502 U.S. 367, 381 (1992).  Immediate compliance with Connecticut law to avoid criminal

penalties will harm Kalshi's users in Connecticut and impose intractable technological difficulties

on a very short timeframe.  Sottile Decl. ¶¶ 12-37.  Abrupt cessation would make it difficult to

inform users in Connecticut of their rights and obligations regarding ongoing event contracts and

would risk cutting off users' access to their investments on Kalshi's exchange. *Id*. ¶¶ 29-37.  Given

that the Connecticut laws are clearly preempted by federal law as applied to Kalshi, the balance of

the equities and public interest firmly favor preliminary relief.

### D.  No Security—Or Only a *De Minimis* Security—Is Appropriate.

Federal Rule of Civil Procedure 65(c) requires a party seeking a preliminary injunction to

"give[] security in an amount that the court considers proper to pay the costs and damages sustained

by any party found to have been wrongfully enjoined or restrained."  "[T]he amount of any bond

to be given upon the issuance of a preliminary injunction rests within the sound discretion of the

trial court."  *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).  Defendants will suffer

no nonspeculative damage by halting enforcement against Kalshi during the pendency of this

litigation.   Accordingly, no security is needed.   *Id.* (affirming decision not to require bond).

Alternatively, should the Court require a security, only a *de minimis* security is warranted.

## <u>CONCLUSION</u>

For the foregoing reasons, the Court should grant a preliminary injunction.


Dated: December 5, 2025                          Respectfully submitted,
Hartford, Connecticut

                                     _/s/  Vanessa Roberts Avery_
                                    Vanessa Roberts Avery (ct21000)
                                    **McCarter & English, LLP**
                                    CityPlace I, 185 Asylum Street
                                    Hartford, CT 06103
                                    Telephone: (860) 275-6700
                                    vavery@mccarter.com

                                    Neal Katyal (admitted *pro hac vice*)
                                    Joshua B. Sterling (admitted *pro hac vice*)
                                    William E. Havemann (admitted *pro hac vice*)
                                    **Milbank LLP**
                                    1101 New York Avenue NW
                                    Washington D.C. 20005
                                    Telephone: 202-835-7500
                                    Facsimile: 202-263-7586
                                    nkatyal@milbank.com
                                    JSterling@milbank.com
                                    WHavemann@milbank.com

                                    Grant R. Mainland (admitted *pro hac vice*)
                                    Andrew L. Porter (admitted *pro hac vice*)
                                    **Milbank LLP**
                                    55 Hudson Yards
                                    New York, NY 10001
                                    Telephone: 212-530-5000
                                    Facsimile: 212-530-5219
                                    GMainland@milbank.com
                                    APorter@milbank.com

                                    *Attorneys for KalshiEX LLC*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on December 5, 2025, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated below. Parties may access this filing through the Court's CM/ECF System.


By:     */s/ Vanessa Roberts Avery*
Vanessa Roberts Avery (ct21000)