# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

KALSHIEX LLC,

     *Plaintiff*

v.

BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut,

     *Defendants*

Case No.: 3:25-cv-02016 (VDO)

**DEFENDANTS' OPPOSITION TO MOTION FOR PRELIMINARY INJUNCTION**

January 9, 2026

## INTRODUCTION

KalshiEX LLC ("Kalshi") asks this Court to green-light its offer of sports wagers to Connecticut residents without complying with Connecticut sports wagering law. Its attempt to evade state law requires the Court to abandon common sense and ignore bedrock principles of federalism and statutory interpretation. It requires finding that in the Dodd-Frank legislation meant to prevent another 2008 financial crisis, Congress made illegal sports wagers untouchable by states so long as they are offered on a designated contract market ("DCM")—and it did so without the states, federal regulators, the industry, or the courts noticing.

Granting Kalshi's motion also means ignoring Kalshi's admission, weeks before it started offering sports event contracts, that "a contract on the outcome of a sporting event" is a "classic example" of "gaming" that should not be "conducted on derivatives

markets" in the first place. Brief of Appellee KalshiEx LLC 41, *KalshiEX LLC v. CFTC*, 24-5205 (D.C. Cir. Nov. 15, 2024) ("Kalshi D.C. Cir. Brief") (Exhibit A). Kalshi was right. Treating sports wagers as federally regulated derivates is not just legally untenable; it is practically unthinkable. If Kalshi's position is taken seriously, it would disrupt centuries of unquestioned state authority over gambling and transfer it to federal regulators who have never had that authority and do not want it.

As of this filing, four successive District Court cases have properly denied event contract offerors' end-runs around state gambling law. Vacating its preliminary ruling in Kalshi's favor, one court realized that "[i]t is absurd to think that Congress intended for DCMs to turn into nationwide gambling venues on every topic under the sun to the exclusion of state regulation and with no comparable federal regulator without ever mentioning that was the goal…." *KalshiEx, LLC v. Hendrick*, No. 2:25-cv-575, 2025 U.S. Dist. LEXIS 234246, at *32 (D. Nev. Nov. 24, 2025) ("*Hendrick II*") (cleaned up).

Kalshi fails to establish a clear or substantial likelihood of success at exempting its sports wagers from Connecticut gaming law. These contracts represent unlicensed, illegal gambling under time-worn state law. Moreover, Kalshi cannot show it will suffer irreparable harm from ceasing its own unlawful conduct, and public policy weighs decisively against its bid for an injunction.

**CONTENTS**

INTRODUCTION ............................................................................................................ 1

BACKGROUND ........................................................................................................... 4

    A.    The Parties ................................................................................................. 4

    B.    Connecticut has historically prohibited unlicensed gambling. .................................... 5

    C.    Kalshi offers unlawful sports wagers disguised as derivatives.................................. 7

    D.    The evolution of federal commodity trading law has not displaced Connecticut's right to regulate sports wagers............................................................................. 9

    E.    DCP issued a cease-and-desist letter to Kalshi pursuant to its regulatory authority..11

PENDING LITIGATION AND PROCEDURAL HISTORY ...........................................................12

LEGAL STANDARD ....................................................................................................13

ARGUMENT ............................................................................................................14

    I.    Kalshi cannot show a clear or substantial likelihood of success on the merits............14

        a.    The Court can determine whether Kalshi's sports event contracts are swaps. .......14

        b.    Kalshi's sports event contracts are not swaps........................................................15

            i.    Kalshi's sports event contracts are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event." ....................15

            ii.    Kalshi's sports event contracts are not "associated with a potential financial, economic, or commercial consequence."....................................................17

            iii.    Defining sports wagers as swaps would lead to absurd and unintended results...............................................................................................18

            iv.    Defining sports wagers as swaps would hinder or impliedly repeal multiple federal laws. ...............................................................................19

            v.    The legislative history shows that Congress did not intend to define swaps to include sports wagers. ................................................................21

        c.    Even if Kalshi's sports event contracts are swaps, the CEA does not preempt state regulation or enforcement. ..............................................................................22

            i.    The CEA does not field-preempt Connecticut from regulating sports wagering...............................................................................................22

            ii.    The CEA does not conflict-preempt Connecticut from regulating sports wagering...............................................................................................27

    II.    Kalshi has not shown it is likely to suffer irreparable harm absent a preliminary injunction. ..................................................................................................30

    III.    The public interest weighs against granting a preliminary injunction. ........................35

    IV.    Kalshi should be required to post a bond. .................................................37

CONCLUSION ..........................................................................................................38

**BACKGROUND**

A.      **The Parties**

**Plaintiff**

Kalshi is a Manhattan-based financial technology company on whose online platform consumers trade "event contracts." In general, event contracts are a species of derivatives, contracts whose value derives from the value of an underlying asset. *KalshiEX LLC v. CFTC*, No. 23-cv-3257 (JMC), 2024 U.S. Dist. LEXIS 163925, at *3-4 (D.D.C. Sept. 12, 2024). Kalshi is a DCM, an entity regulated by the Commodity Futures Trading Commission ("CFTC") under the Commodity Exchange Act, 7 U.S.C. § 1 *et seq.* ("CEA"). Since January 2025 Kalshi has offered event contracts related to the outcomes of sporting events ("sports event contracts"). [ECF 1 ¶ 43.]

**Defendants**

The Department of Consumer Protection ("DCP") "regulates gaming in the State of Connecticut by licensing or permitting all individuals and entities that are involved with legalized gambling, and by monitoring and educating to ensure compliance with Connecticut's gaming laws." [ECF 1 ¶ 20.] DCP also enforces the Connecticut Unfair Trade Practices Act, Conn. Gen. Stat. § 42-110b *et seq.* ("CUTPA"), which prohibits unfair methods of competition and unfair or deceptive acts or practices in trade or commerce. Bryan T. Cafferelli is DCP's Commissioner and Kristofer Gilman is DCP's Director of Gaming. Kalshi also sues Attorney General William Tong, who it claims "would be responsible for enforcing any demand for Kalshi to comply with Connecticut state law that is preempted by federal law." *Id.* ¶¶ 21-22.

4

**B.     Connecticut has historically prohibited unlicensed gambling.**

This case centers on Connecticut's right to control illegal gambling within its borders. The State has a well-established strict stance against unlawful wagering, an "ancient and deep-rooted public policy" dating to before Connecticut joined the Union. *See Ciampittiello v. Campitello*, 134 Conn. 51, 56 (1947) (noting 1778 statute prohibiting wagering on horse races). "Since the establishment of our government[,] wagering has been held to be, if not absolutely immoral, yet so injurious in its results as to require suppression by penal legislation." *State v. Harbourne*, 70 Conn. 484, 490 (1898). Connecticut is hardly alone. Until recently, "all forms of sports gambling were illegal in the great majority of States." *Murphy v. NCAA*, 584 U.S. 453, 467-68 (2018).

This policy is embodied in both criminal and civil statutes. Connecticut General Statutes § 53-278b(a) penalizes "gambling," or "solicit[ing] or induc[ing] another to engage in gambling," defined as "risking any money, credit, deposit or other thing of value for gain contingent in whole or in part upon lot, chance or the operation of a gambling device," *id*. § 53-278a(2). Section 53-278b(b) criminalizes "professional gambling," defined as "accepting or offering to accept, for profit, money, credits, deposits or other things of value risked in gambling, or any claim thereon or interest therein,"[1] *id*. § 53-278a(3). General Statutes § 52-553 voids unlawful sports gambling contracts.

In 2021, the Connecticut General Assembly created a narrow exception to the prohibitions against gambling by establishing a tightly controlled, exclusive sports wagering market under DCP's regulation. 2021 Conn. Acts, No. 21-23; Conn. Gen. Stat.

---

[1] There are exemptions and exceptions not relevant to Kalshi's preemption claim. Conn. Gen. Stat. §§ 53-278a(2); 53-278g(a).

§ 12-850 *et seq.*[2] Sports wagering must be "authorized by" or "conducted pursuant to" the regulatory scheme to be exempted from the criminal and civil prohibitions against gambling. *Id.* §§ 52-553; 53-278g(a); 53-278a(2). Sports wagering is permitted only under the auspices of one of three "master wagering licensees": "the Mashantucket Pequot Tribe, or an instrumentality of or an affiliate wholly-owned by said tribe"; "the Mohegan Tribe of Indians of Connecticut, or an instrumentality of or an affiliate wholly-owned by said tribe"; or "the Connecticut Lottery Corporation." *Id.* § 12-850(21). Only a master wagering licensee, or a licensed entity on its behalf, may offer online sports wagering. *Id.* §§ 12-855; 12-857.

The General Assembly was mindful of the dangers of unchecked sports wagering. It imposed consumer protection requirements such as excluding minors (those under 21), restricting advertising aimed exclusively at minors, enacting measures to prevent unauthorized use of wagering accounts, and maintaining security of users' information. Conn. Gen. Stat. § 12-863(a)-(c), (e). Licensees must ensure that users are in the State or on Tribal reservations in the State's borders when placing wagers. *Id.* § 12-863(a)-(b). Licensees must also take steps to mitigate problem gaming; among other requirements, operators must offer self-exclusion options and self-spending limitations, *id.* § 12-863(c)(5), provide disclosures about problem gaming, *id.* § 12-863(c)(6)-(7), and, where applicable, display information about the amount of time a user has spent on a gaming website or app and how much money remains in their accounts, *id.* § 12-

---

[2] Sports wagering is defined as, in relevant part: "risking or accepting any money, credit, deposit or other thing of value for gain contingent in whole or in part, (A) by any system or method of wagering, including, but not limited to, in person or through an electronic wagering platform, and (B) based on (i) a live sporting event or a portion or portions of a live sporting event, including future or propositional events during such an event, or (ii) the individual performance statistics of an athlete or athletes in a sporting event or a combination of sporting events." Conn. Gen. Stat. § 12-850(34).

863(c)(7). They must also contribute funding for gambling treatment and rehabilitation programs from wagering revenues. *Id.* § 12-871.

### C. Kalshi offers unlawful sports wagers disguised as derivatives.

Kalshi is not licensed to offer sports wagering in Connecticut, and it refuses to comply with the wagering safeguards under state law. Yet it proudly offers sports wagers in Connecticut nonetheless, claiming they are federally regulated derivatives.

Though it is reluctant to say so here, Kalshi certifies that its event contracts are "swaps," a category of derivative used to hedge against economic risk. Exhibit C (listing Kalshi event contract certifications as "Swap (Binary Option)").[3] Typically, swaps involve "the exchange of cash flows from financial instruments," *Inv. Co. Inst. v. CFTC*, 720 F.3d 370, 373 (D.C. Cir. 2013), allowing parties to trade risky or variable returns for more certain ones and vice versa. For instance, parties might agree to swap future interest payments at different rates, or future payments in one currency for payments in another. As discussed *infra*, the definition of swaps under the CEA now includes certain event contracts. Though certain Kalshi event contracts may meet the swap definition, *see* [ECF 1 ¶ 23; No. 30-1 at 3] (referring to swaps related to natural disasters), the contracts at issue in this case do not.

Kalshi's sports event contracts include which team or player will win a sporting event, how many wins each team will have, and outcomes of individual games, including games for which Connecticut's master wagering licensees are prohibited from

---

[3] The Court may consider otherwise inadmissible evidence submitted by the parties at the preliminary injunction stage. "[T]he decision of whether to award preliminary injunctive relief is often based on procedures that are less formal and evidence that is less complete than in a trial on the merits." *Mullins v. City of New* York, 626 F.3d 47, 51-52 (2d Cir. 2010) (cleaned up). "[H]earsay evidence may be considered by a district court in determining whether to grant a preliminary injunction. The admissibility of hearsay under the Federal Rules of Evidence goes to weight, not preclusion, at the preliminary injunction stage." *Id.* at 52.

offering wagers in Connecticut.[4] It also offers a vast array of contracts that are essentially prop bets, including the number of runs in a baseball game, whether a hockey player will record a certain statistic in a certain game, or whether a boxer will win a match by a certain method. Exhibit B 1, 12, 31. For some sports, Kalshi even offers what it calls "combos," which are parlays in all but name. *Id.* at 40. Kalshi has even offered contracts on whether an announcer will say the phrase, "What a catch*." E.g. What will the announcers say during the Miami at New England professional football game?* Kalshi, https://perma.cc/AHJ2-VW6S. If the Court struggles to see how a "combo" on whether the Broncos and the Giants both win on Sunday, or a wager on whether an announcer uses a catchphrase, fit in the same legal category as risk-hedging derivatives, it is not alone.

Kalshi's sports event contracts are not swaps but simply wagers that happen to be conducted on a DCM. They serve no hedging interest. They involve consumers "risk[ing]" money "for gain contingent in whole or in part" on "chance" based on outcomes of sporting events and do not meet any statutory exception. For proof, the Court need look no further than Kalshi's own advertisements, which have unabashedly called its offerings betting, referring to Kalshi as a "legal sports betting platform." Dustin Gouker, *Ten Times Kalshi Said People Could Bet on Things*, Event Horizon (Apr. 3, 2025) https://perma.cc/4CLZ-4Y2D.

Kalshi's use of sports event contracts to dodge state gambling law has been fabulously lucrative, which, of course, is the point. By its own report, Kalshi has seen

---

[4] Kalshi offers event contracts for the outcome of Connecticut intercollegiate sporting events. Licensees are prohibited from offering wagers on certain sporting events that include Connecticut intercollegiate teams. Conn. Gen. Stat. § 12-850(32)

over a thousand percent growth in trading volume since 2024, just before it began offering sports event contracts. *Kalshi Reaches $11 Billion Valuation as App Takes Over America*, Kalshi, https://perma.cc/HBA2-NMDY. As of December 2, 2025, Kalshi reported being valued at $11 billion, *id.*, up from a reported $2 billion in June 2025, Julie Bort, *Kalshi closes $185m round as rival Polymarket reportedly seeks $200m*, TechCrunch (June 25, 2025), https://perma.cc/5UTL-6S65.

D. **The evolution of federal commodity trading law has not displaced Connecticut's right to regulate sports wagers.**

In 1936, over 150 years after Connecticut began regulating wagering, Congress passed the CEA. Pub. L. No. 74-675, 49 Stat. 1491. "The CEA was enacted during the Great Depression in response to concerns about manipulation, speculation, and other abuses that could arise from trading derivatives…." *U.S. v. Phillips*, 155 F.4th 102, 112 (2d Cir. 2025) (cleaned up). It aimed to help prevent fraud and guard against dangerous speculation in futures on agricultural commodities like grain. *See generally Merrill Lynch, Pierce, Fenner & Smith v. Curran*, 456 U.S. 353, 360-63 (1982) (tracing CEA's development). In 1974, the Commodity Futures Trading Commission Act created the CFTC and expanded the CEA's authority to include futures trading in virtually all commodities, including non-agricultural financial contracts. Pub. L. No. 93-463, 88 Stat. 1389. While CEA's remit changed, its purpose—protecting against manipulation and rampant speculation in commodities markets—did not.

After the 2008 financial crisis, of which "many saw the previous lack of regulation in swaps as a contributing cause," *Phillips*, 155 F.4th at 113, Congress passed the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111-203, 124 Stat. 1376 (2010) ("Dodd-Frank"). Dodd-Frank's purpose was to "promote the financial

stability of the United States by improving accountability and transparency in the financial system." *Phillips*, 155 F.4th at 113. Dodd-Frank brought most swaps under the CFTC's jurisdiction for the first time, "corrall[ing] what had been a Wild West of swaps trading," *id.* In doing so, it defined "swaps" to include event contracts. 7 U.S.C. § 1a(47). While Dodd-Frank turned swap regulation over to the CFTC, it maintained the CEA's preexisting saving clause preserving state regulatory and judicial authority:

> Except as hereinabove provided, nothing contained in this section shall (I) supersede or limit the jurisdiction at any time conferred on the Securities and Exchange Commission or other regulatory authorities under the laws of the United States or of any State, or (II) restrict the Securities and Exchange Commission and such other authorities from carrying out their duties and responsibilities in accordance with such laws. Nothing in this section shall supersede or limit the jurisdiction conferred on courts of the United States or any State.

7 U.S.C. § 2(a)(1)(A).

Dodd-Frank also created a special rule governing the issuance of event contracts ("Special Rule"). 7 U.S.C. § 7a-2(c)(5)(C)(i). The Special Rule permits the CFTC to prohibit event contracts involving "activity that is unlawful under any Federal or State law," "terrorism," "assassination," "war," "gaming," or "other similar activity determined by the Commission, by rule or regulation, to be contrary to the public interest." *Id.* While "gaming" is undefined, the D.C. District Court correctly interpreted it—as Kalshi once urged—to include contracts on the outcome of sporting events. *KalshiEX LLC v. CFTC*, No. 23-cv-3257 (JMC), 2024 U.S. Dist. LEXIS 163925, at *21-22, 37 (D.D.C. Sept. 12, 2024), *voluntarily dismissed*, No. 24-5205, 2025 U.S. App. LEXIS 11094 (D.C. Cir. May 7, 2025); Exhibit A 41. The CFTC implemented this provision by outright prohibiting "list[ing] for trading or accept[ing] for clearing" any contract "that involves, relates to, or

references" conduct in those categories or "an activity that is similar" thereto. 17 C.F.R. § 40.11(a)(1)-(2).

As amended by Dodd-Frank, the CEA authorizes the CFTC to review the issuance of new swaps, allowing DCMs to either petition CFTC for advance approval, or to offer them after self-certifying that they comply with the law. 7 U.S.C. § 7a-2(c)(1)-(5). The CFTC has not pre-approved any sports event contracts for trading on DCMs. A September 30, 2025 CFTC staff advisory noted that all sports event contracts "currently listed for trading on DCMs have been listed pursuant to self-certifications" and that the CFTC "has not, to date, made a determination regarding whether any such contracts involve an activity enumerated or prohibited under" the CEA or its regulations. CFTC Letter No. 25-36 (Sept. 30, 2025) (Exhibit D). CFTC staff noted "various forms of State regulatory actions and pending and potential litigation concerning the legality of sports-related event contracts listed on DCMs," and advised "appropriate contingency planning, disclosures, and risk management policies and procedures" to account for such State action. *Id.*

E.   **DCP issued a cease-and-desist letter to Kalshi pursuant to its regulatory authority.**

On December 2, 2025, DCP sent Kalshi a cease-and-desist letter warning that it "is conducting unlicensed online gambling, more specifically sports wagering, in Connecticut through its online sports event contracts ('Contracts')" and ordering it to "immediately cease and desist advertising and offering its Contracts to Connecticut residents." [ECF 30-3.] The letter cited the statutes governing unlicensed gambling as

well as CUTPA, noting that Kalshi's conduct is deceptive and unfair, including in that it "is able to gain a competitive advantage over appropriately licensed entities." *Id.* at 2.[5]

## PENDING LITIGATION AND PROCEDURAL HISTORY

This is at least Kalshi's sixth attempt to enjoin state regulators from addressing its sports event contracts, after suing Nevada, New Jersey, Maryland, Ohio, and New York. The Maryland District Court denied Kalshi's motion, *KalshiEX LLC v. Martin*, No. 25-cv-1283, 2025 U.S. Dist. LEXIS 147815, at *1 (D. Md. Aug. 1, 2025) ("*Martin*"), *appeal docketed*, No. 25-1892 (4th Cir. Aug. 6, 2025), while the District of Nevada granted Kalshi an injunction but later vacated it. *Kalshiex, LLC v. Hendrick*, No. 2:25-cv-575, 2025 U.S. Dist. LEXIS 67832, at *1 (D. Nev. Apr. 9, 2025) ("*Hendrick I*"). The same District Court also denied similar injunction motions filed by Kalshi's competitor, Crypto.com, *N. Am. Derivatives Exch., Inc. v. Nevada ex rel. Nev. Gaming Ctrl. Bd.*, No. 2:25-cv-978, 2025 U.S. Dist. LEXIS 202104, at *1 (D. Nev. Oct. 14, 2025) ("*Crypto*"), and against Kalshi's futures commission merchant partner, Robinhood. *Robinhood Derivatives, LLC v. Dreitzer*, No. 2:25-cv-1541, 2025 U.S. Dist. LEXIS 231144, at *1 (D. Nev. Nov. 25, 2025) ("*Robinhood*").[6]

As of this filing, preliminary injunction motions are pending in the Ohio and New York cases and in a separate action filed against Kalshi by Massachusetts. *KalshiEX,*

---

[5] Despite the cease-and-desist letter's limiting itself to sports event contracts, *see* [ECF 30-3] (defining "Contracts" as "online sports event contracts"), Kalshi reads into it a demand to cease offering *all* event contracts, claiming "DCP's theory is that *all* event contracts amount to unlawful gambling" [ECF 1 ¶ 49]. To be clear, DCP does not contend that "all event contracts amount to unlawful gambling."

[6] The only surviving District Court decision in Kalshi's favor is *KalshiEX LLC v. Flaherty*, No. 25-cv-2152, 2025 U.S. Dist. LEXIS 79893, at *1 (D.N.J. Apr. 28, 2025) ("*Flaherty*"), *appeal docketed*, No. 25-1922 (3d Cir. May 15, 2025). *Flaherty*, decided early in Kalshi's litigation spree, relied heavily on the now-defunct *Hendrick I* and was decided before *Hendrick II*. It includes little independent reasoning about whether Kalshi's sports event contracts are, in fact, swaps, and if so, why federal preemption should apply, and is on appeal in the Third Circuit.

*LLC v. Schuler*, No. 2:25-cv-1165 (S.D. Oh.); *KalshiEX LLC v. Williams*, No. 25-cv-8846 (S.D.N.Y.); *Commw. v. KalshiEX LLC*, No. 2584-cv-2525 (Mass. Super. Ct.).

Kalshi filed this suit on December 3, 2025, and its Motion for Preliminary Injunction ("Motion") on December 5. Defendants agreed to refrain from taking enforcement action against Kalshi regarding any conduct described in the cease-and-desist letter pending the disposition of the Motion. [ECF 11, 35.]

## LEGAL STANDARD

Kalshi's Motion faces a high burden in seeking to enjoin the State from its statutory or regulatory duties in the public interest. "A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. NRDC, Inc.*, 555 U.S. 7, 24 (2008). It "should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). "[C]ourts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction." *Winter*, 555 U.S. at 24. "When a preliminary injunction will affect government action taken in the public interest pursuant to a statute or regulatory scheme, the moving party must demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Kane v. De Blasio*, 19 F.4th 152, 163 (2d Cir. 2021). In such cases, the plaintiff "must establish a clear or substantial likelihood of success on the merits." *Cnty. of Nassau v. Leavitt*, 524 F.3d 408, 414 (2d Cir. 2008).

**ARGUMENT**

Kalshi's Motion must be denied because it fails to establish any of the preliminary injunction elements.

**I.      Kalshi cannot show a clear or substantial likelihood of success on the merits.**

Kalshi cannot show a likelihood of success on the merits, let alone a "clear or substantial" one. *Cnty. of Nassau*, 524 F.3d at 414. Kalshi's sports event contracts are not swaps falling under CFTC jurisdiction in the first place, and even if they are, the CEA does not preempt the State from enforcing gaming law as to them.

**a.      The Court can determine whether Kalshi's sports event contracts are swaps.**

Kalshi jumps to a preemption analysis, taking as given that its self-certification of sports event contracts as swaps, and the absence of express CFTC disapproval, means they are swaps and therefore that preemption is a possibility.[7] But the Court's determination—not Kalshi's self-certification or CFTC's inaction—controls. 7 U.S.C. § 2(a)(1)(A) provides that "[n]othing in this section shall supersede or limit the jurisdiction conferred on courts of the United States." *See Crypto*, 2025 U.S. Dist. LEXIS 202104, at *17-18 ("the CEA does not expressly delegate to the CFTC the exclusive power to decide what is a swap"); *see also Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 391-92 (2024) (reciting "unremarkable, yet elemental proposition reflected by judicial

---

[7] Kalshi may now attempt to hedge its bets and claim that its event contracts are not swaps, but another type of contract over which the CFTC has jurisdiction, such as "options." 7 U.S.C. § 2(a). The Court should reject this maneuver as the *Hendrick II* court did, 2025 U.S. Dist. LEXIS 234246, at *33 n.8, because it ignores Kalshi's self-certifications that these are swaps (Exhibit C) as well as its continual representations to that effect in its other cases.

practice dating back to *Marbury*: that courts decide legal questions by applying their own judgment").[8]

As relevant here, the CEA defines a swap as: "any agreement, contract, or transaction…that provides for any purchase, sale, payment, or delivery (other than a dividend on an equity security) that is dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event or contingency associated with a potential financial, economic, or commercial consequence," 7 U.S.C. § 1a(47)(A)(ii).

**b.    Kalshi's sports event contracts are not swaps**

**i.    Kalshi's sports event contracts are not "dependent on the occurrence, nonoccurrence, or the extent of the occurrence of an event."**

Kalshi's sports event contracts fail the first part of the swaps definition because they do not depend on whether sporting events "occur," but only on their outcomes.

In construing the definition of a swap, the Court must "attempt to give effect to the plain meaning of each word," *Assocs. Against Outlier Fraud v. Huron Consulting Grp., Inc.*, 817 F.3d 433, 437 (2d Cir. 2016), accounting for Congress' choice of the separate words "occurrence" and "event." The Nevada District Court defined "occurrence" as "something [that] happened," and "event" as "a happening of some significance that took place or will take place, in a certain location, during a particular interval of time, such as a particular sporting event or an organized activity or celebration for the public or a particular group." *Crypto*, 2025 U.S. Dist. LEXIS 202104,

---

[8] One court recently held that it lacked jurisdiction to determine whether Kalshi event contracts violate the CEA. *Blue Lake Rancheria v. Kalshi Inc.*, No. 25-cv-6162, 2025 U.S. Dist. LEXIS 221764, at *20 (N.D. Cal. Nov. 10, 2025). That holding was sparsely reasoned and appears to ignore the surrounding statutory text (as well as *Loper Bright*). The decision also does not acknowledge the more thorough analysis in the prior *Crypto* decision, which reached the opposite result.

at *21-22; *see id.* at *19-21 (citing dictionaries). In the context of sporting events, "the ordinary meaning of event…would be the sporting event itself, not who wins it." *Id.* at *22.[9] The court rejected, as this Court should, expansive definitions of "occurrence" or "event" that both amount to "anything that happens," as that would render superfluous Congress' separate definitions of specific types of swaps, *id.* at *21, 23-24, and because, as explained in *Hendrick II*, "Congress did not define a swap as a contract on anything that happens or could happen." 2025 U.S. Dist. LEXIS 234246, at *22. Swaps are hedging tools, and there is no genuine basis to hedge against trivial happenings such as points scored during a football game.

Kalshi has agreed with these usages of "event" and "occurrence." In its disclosures to CFTC and its customers, Kalshi describes the basis for its sports contracts as the "*outcome* of a recurrent event" or the "official *result* of" a sporting event (emphasis added). Exhibit E. Kalshi's use of the separate terms "event" to refer to a sporting contest and "outcome" (or "result") to refer to what happens at that contest is consistent with ordinary usage and the *Crypto* court's reasoning.

Defendants note that the *Flaherty* decision [ECF 30-1 at 13], does not analyze whether Kalshi's sports event contracts relate to an "event" or "occurrence" at all. 2025 U.S. Dist. LEXIS 79893, at *16-17. This is a fatal flaw, as there can be no preemption if Kalshi's conduct falls outside the federal statutory scheme.

---

[9] While a court in this District noted that one dictionary's definition for "event" includes an "outcome," *Prysmian Cables & Sys. USA LLC v. ADT Commer. LLC*, 665 F. Supp.3d 236, 246 (D. Conn. 2023), it referred to the Oxford English Dictionary; in contrast, the New Oxford *American* Dictionary's primary definition for "event" is "a thing that happens, esp. one of importance," consistent with the Nevada court's, and it does not include "outcome" as a standard definition. New American Oxford Dictionary (2d ed.)

### ii. Kalshi's sports event contracts are not "associated with a potential financial, economic, or commercial consequence."

Kalshi's sports event contracts also are not "associated with a potential financial, economic, or commercial consequence." A definition of swaps that encompasses the *de minimis* impacts of the outcomes of sporting events or titles, individual athletic achievements, or combinations thereof would make that provision meaningless.

The *Hendrick II* court held that swaps require "that the event or contingency is itself inherently joined or connected with a potential financial, economic, or commercial consequence." 2025 U.S. Dist. LEXIS 234246, at *22 (cleaned up). And they do not "include consumer transactions that have not historically been known to be swaps, such as sports wagers." *Id.* at *22-23. The Court should apply this definition. It comfortably includes event contracts that are genuine hedging instruments, such as the varieties of swaps Congress expressly included elsewhere in the definition, *e.g.*, swaps on currency, credit defaults, weather, and energy, 7 U.S.C. § 1a(47)(A)(iii)(I)-(XXII). The same cannot be said for Kalshi's sports event contracts. The number of runs in a baseball game cannot possibly change the economic, financial, or commercial outcome for anyone except (perhaps) the players themselves. Moreover, the *Hendrick II* interpretation gives effect to the word "associated," requiring a proximate connection between the event and the consequence. A broader definition would allow DCMs to turn commodities trading into a game, sweeping in contracts on any happening with a conceivable financial ripple effect. *See Assocs. Against Outlier Fraud*, 817 F.3d at 437 (courts must "give effect, if possible, to every clause and word of a statute"). Here, too, Kalshi has agreed with Defendants. It argued to the D.C. Circuit that "contracts relating

to games—again, activities conducted for diversion or amusement—are unlikely to serve any 'commercial or hedging interest.'" Exhibit A 45.

Indeed, Kalshi *bans* from trading sports event contracts those for whom such contracts *might* serve a commercial or hedging interest, just like a sports book: it prohibits trading by players, coaches, team and league owners, and their families. *See*, *e.g.*, Exhibit B 11. If these are truly risk-hedging products, such anti-fixing prohibitions are nonsensical, akin to barring farmers from hedging against a risk of crop failure.

The *Flaherty* decision's reference to this part of the swap definition is cursory at best. It does not appear to analyze the issue independently, acknowledging only hypothetical assertions in Kalshi's brief about impacts on, *e.g.*, television viewership and advertising. *Flaherty*, 2025 U.S. Dist. LEXIS 79893, at *16-17. These are remote, attenuated consequences that could arise from virtually any happening, and which the court in *Hendrick II* appropriately rejected.

### iii. Defining sports wagers as swaps would lead to absurd and unintended results.

Defining swaps so broadly as to include Kalshi's sports event contracts would make swaps out of contracts on any imaginable event. There is no principled reason that a Kalshi "combo" on both the Giants and Broncos winning is a swap which may be traded on a DCM, while a contract based on the spin of a roulette wheel or the outcome of poker hand is not. After all, those gambling outcomes have a direct and immediate financial consequence, no less than the identity of the winner of a given football game has for sports bettors. But it is preposterous to conclude that Congress intended to turn the nation's commodities exchanges into casinos in this way.

Nor could Congress have intended the reverse, turning casinos into commodity exchanges. Consider the logical result of making sports wagers swaps. Because a core purpose of the CEA is keeping covered transactions on federally regulated exchanges (except in special cases such as institutional investors), 7 U.S.C. §§ 1a(18); 2(e); 6(a); *U.S. v. Phillips*, 155 F.4th at 112, if sports wagers are swaps, then state-regulated sportsbooks, casinos, or licensed online gaming providers would be violating federal law by offering them outside of a CEA exchange. This is an absurd proposition that Kalshi surely disavows. But under Kalshi's reasoning, that is inevitable because if these entities were *permitted* to offer swaps off-exchange in the "Wild West," then the standardization and stability aims of Dodd-Frank would be thwarted, as presumably credit default swaps (among others) could also be traded off-exchange. Congress cannot have intended such a nonsensical and self-defeating result.

### iv. Defining sports wagers as swaps would hinder or impliedly repeal multiple federal laws.

Defining swaps to include sports wagers would also seriously undermine, if not effectively repeal, multiple federal statutory schemes, with no evidence of Congressional intent to do so. There is a "strong presumption that repeals by implication are disfavored and that Congress will specifically address preexisting law when it wishes to suspend its normal operations in a later statute." *Epic Sys. Corp. v. Lewis*, 584 U.S. 497, 510 (2018) (cleaned up). Similarly, "Congress does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Id.* at 515 (cleaned up).

<u>First</u>, when Dodd-Frank vested the CFTC with jurisdiction over swaps in 2010, the Professional and Amateur Sports Protection Act, Pub. L. No. 102-559, 106 Stat.

4227 ("PASPA"), ensured sports wagering was illegal virtually nationwide. Though PASPA was overturned by *Murphy v. NCAA*, 584 U.S. 453 (2018), its prohibition on licensed sports wagering coexisted with CFTC's swaps jurisdiction for eight years. If Congress intended Dodd-Frank to convert sports wagers to swaps, sidelining PASPA by permitting sports wagers on CEA exchanges, it would have explicitly said so (and, one assumes, the Supreme Court would have mentioned swaps or Dodd-Frank in *Murphy*).

Second, the Interstate Wire Act, Pub. L. No. 87-216, 75 Stat. 491 ("Wire Act"), prohibits interstate transmissions of bets or wagers "on any sporting event or contest," or information relating thereto. 18 U.S.C. § 1084(a). DCMs' interstate offer of unlawful sports wagers likely violates the Act. To conclude otherwise is to hold that Dodd-Frank hollowed out the Wire Act, creating a sports wagering exception by implication. There is no reason to believe Congress intended this. The Department of Justice ("DOJ"), for one, did not believe it did. In a 2011 opinion, after Dodd-Frank's enactment, the DOJ reaffirmed that the Wire Act prohibited interstate transmissions related to a "sporting event or contest." Exhibit F. The DOJ memo contains no reference to Dodd-Frank, the CEA, or swaps, because no one believed that Dodd-Frank weakened or affected the sports wagering laws in any way. Concluding that trading sports wagers on DCMs is lawful would require ignoring, or reading a new exemption into, the Wire Act, both of which are unsupportable when the alternative gives full effect to both statutes. *See Morton v. Mancari*, 417 U.S. 535, 551 (1974) ("when two statutes are capable of co-existence, it is the duty of the courts, absent a clearly expressed congressional intention to the contrary, to regard each as effective").

Third, the Indian Gaming Regulatory Act, Pub. L. No. 100-497, 102 Stat. 2467 ("IGRA") permits certain gaming activity on Indian land if, inter alia, both the tribe and the relevant state permit the activity and it is "conducted in conformance with a Tribal-State compact." 25 U.S.C. § 2710(d)(1)(C). Sports wagering is such an activity in Connecticut. But if wagers are swaps, then they cannot be conducted—even in conformance with a compact—except on CEA exchanges. This would effectively remove sports wagering from the category of gaming that states and tribes can agree to permit, depriving tribes of revenue secured through compacts with the states. Opening the floodgates to sports wagering otherwise violated by tribal law also undermines Tribal sovereignty by limiting tribes' ability to regulate conduct within their borders, with no hint in Dodd-Frank or elsewhere that Congress intended to do so.

Dodd-Frank does not reference PAPSA, the Wire Act, or IGRA. If Congress intended Dodd-Frank to impact any one of these preexisting federal statutes, let alone all of them, it would not have hidden those changes in a definitional "mousehole."

### v. The legislative history shows that Congress did not intend to define swaps to include sports wagers.

Finally, the legislative history shows that Congress sought to *prevent*, not protect, gambling on CEA-regulated exchanges when entrusting CFTC with jurisdiction over swaps. The rationale behind the Special Rule was to curb event contracts "used predominantly by speculators or participants not having a commercial or hedging interest," 156 Cong. Rec. S. 5902, 5906 (statement of Sen. Feinstein), and to "prevent gambling through futures markets," and "protect the public interest from gaming contracts," *id.* (statement of Sen. Lincoln). To that end, the CFTC "should[] prevent derivatives contracts that are contrary to the public interest because they exist

predominantly to enable gambling through supposed 'event contracts." *Id.* at 5906-07. Senator Lincoln commented that "[i]t would be quite easy to construct an 'event contract' around sporting events such as the Super Bowl, the Kentucky Derby, and Masters Golf Tournament. These types of contracts would not serve any real commercial purpose. Rather, they would be used solely for gambling." *Id.* at 5907.

Kalshi has previously cited all of this legislative history approvingly—before it began making billions offering sports event contracts. *See* Exhibit A 17 (acknowledging "[a]n event contract therefore involves 'gaming' if it is contingent on a game or game-related event—like the Kentucky Derby, Super Bowl, or Masters golf tournament"). Again, Kalshi was right—until it changed its tune.

### c. Even if Kalshi's sports event contracts are swaps, the CEA does not preempt state regulation or enforcement.

Even if a sports event contract could satisfy the CEA's definition of a swap, Kalshi fails to show that Congress meant to preempt the states from exercising traditional police powers over gambling on a DCM under the guise of swaps.

### i. The CEA does not field-preempt Connecticut from regulating sports wagering.

Kalshi fails to demonstrate that Congress intended to trample hundreds of years of state gaming regulation when it assigned swaps regulation to the CFTC. Congress allowed the CFTC's new swaps jurisdiction to complement, rather than crowd out, preexisting state law, taking pains to surgically preempt state gaming law only in certain situations not presented here. Otherwise, Congress would be usurping states' traditional police powers over gambling, silently, and without substituting any competent federal counterpart, creating a new "Wild West."

Kalshi faces a "heavy burden" to demonstrate preemption. *N.Y. Pet Welfare Ass'n v. City of New York*, 850 F.3d 79, 86 (2d Cir. 2017). "In all pre-emption cases, and particularly those in which Congress has legislated in a field which the States have traditionally occupied, we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress." *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (cleaned up). "[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action." *Id.* Only in "rare cases" has the Supreme Court "found that Congress legislated so comprehensively in a particular field that it left no room for supplementary state legislation." *Kansas v. Garcia*, 589 U.S. 191, 208 (2020) (cleaned up).

States have long occupied the field of gambling regulation. *See Ah Sin v. Wittman*, 198 U.S. 500, 505-06 (1905) ("The suppression of gambling is concededly within the police powers of a State …."); *Marvin v. Trout*, 199 U.S. 212, 224 (1905) ("The power of the State to enact laws to suppress gambling cannot be doubted …."). As recently as 2018, the Supreme Court reiterated that "Congress can regulate sports gambling directly, but if it elects not to do so, *each State is free to act on its own.*" *Murphy v. NCAA*, 584 U.S. 453, 486 (2018) (emphasis added). *See also id.* at 467-68 (referring to "old laws banning sports gambling," and noting that at PASPA's enactment in 1992, "all forms of sports gambling were illegal in the great majority of States").

The CEA's "exclusive jurisdiction" provision, covering "accounts, agreements…, and transactions involving swaps" traded on DCMs, 7 U.S.C. § 2(a)(1)(A), does not imply field preemption impacting state anti-gambling laws simply because they touch on

a swap. *See Black v. Corporation Div.*, 54 Ore. App. 432, 440 (1981) ("we do not interpret 'involving' [in § 2] to mean 'touching upon in any way'"). The CEA's saving clause specifically preserves state regulatory jurisdiction, "negat[ing] the inference that Congress 'left no room' for state causes of action." *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 492 (1987). As the *Martin* court noted in rejecting Kalshi's preemption theory, "[t]he question of…the field that Congress intended the [CEA] to 'occupy' simply is not answered by the text of § 2." 2025 U.S. Dist. LEXIS 147815, at *23.[10]

In fact, Dodd-Frank plainly avoided preempting state gaming law in a way that would insulate Kalshi's sports wagers from state regulation. In 7 U.S.C. § 16(h), Congress expressly preempted state *insurance* law in connection with swaps, providing that: "A swap—(1) shall not be considered to be insurance; and (2) may not be regulated as an insurance contract under the law of any State." If Congress had intended the kind of blanket preemption Kalshi asserts, it would have included a mirror image of § 16(h) substituting "gaming" for "insurance." Elsewhere, § 16 does refer to gaming law, but in a way that effectively preserves its operation. It expressly preempts state law "that prohibits or regulates gaming or the operation of bucket shops"[11] in just a few specific cases, such as transactions for foreign currency or government securities,

---

[10] For this reason, Kalshi's citation to *Leist v. Simplot*, 638 F.2d 283 (2d Cir. 1980) [ECF 30-1 at 21-22], is misplaced. *Leist* observed, in passing, only that courts have held the CEA to preempt state law in certain instances, which is undisputed. *See Leist*, 638 F.2d at 322. Other appeals courts that have directly addressed the preemption issue recognized that the CEA preemption is not all-encompassing. *See, e.g.*, *Effex Capital, LLC v. Nat'l Futures Ass'n*, 933 F.3d 882, 894 (7th Cir. 2019) (CEA "did not manifest an intent to occupy completely the entire field of commodity futures regulation"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 589 (D.C. Cir. 2001) (Section 2(a) "confers exclusive jurisdiction to the CFTC over a limited, discrete set of items related to the making of futures contracts").

[11] "The term 'bucket shop' refers to an illegitimate gambling operation, common at the end of the nineteenth century, that permitted investors to place bets upon fluctuations in the market prices of stocks and commodities." *Thrifty Oil Co. v. Bank of Am. Nat'l Trust & Sav. Ass'n*, 322 F.3d 1039, 1055 (9th Cir. 2002).

none of which applies here. *Id*. § 16(e)(2). If Congress intended the "exclusive jurisdiction" clause to preempt state gaming law altogether in connection with swaps, the more specific preemption clauses contained in § 16(e)(2) would be surplusage.

Far from eschewing state law, Congress expressly wove it into the determination of the validity of certain types of event contracts. The Special Rule expressly permits the CFTC to "determine that…agreements, contracts, or transactions are contrary to the public interest," if they involve "activity that is unlawful under any Federal or State law" or "gaming," 7 U.S.C. § 7a-2(c)(5)(C). That language "clearly reflects an affirmative intent to *preserve* state laws governing whether particular conduct is lawful or unlawful." *Martin*, 2025 U.S. Dist. LEXIS 147815, at *24. It would make no sense to hinge the permissibility of certain event contracts on state law but to *prohibit* states from interpreting and applying that law, as DCP does. After all, states, not the CFTC, are the arbiters of what their laws permit or prohibit. *See Spieser v. Randall*, 357 U.S. 513, 522 n.7 (1958) (it is a "basic constitutional principle that the construction of state laws is the exclusive responsibility of the state courts").

That Congress intended to substitute the CFTC as a gaming regulator is even less plausible because the CFTC has no relevant expertise and is ill-suited to the task. As the CFTC observed in a rulemaking document in 2024:

> Moreover, the Commission notes that in the United States, **gambling is overseen by state regulators with particular expertise, and governed by state gaming laws aimed at addressing particular risks and concerns associated with gambling. The Commission is not a gaming regulator.** The CEA and Commission regulations are focused on regulating financial instruments and markets, and **do not include provisions aimed at protecting against gambling-specific risks and concerns, including customer protection concerns inherent to gambling**. Permitting event contracts involving gaming, as proposed to be defined, to trade on CFTC-regulated markets would in effect permit

> instruments commonly understood as bets or wagers on contests or games to avoid these legal regimes and protections. Gambling is a rapidly evolving field, and **the Commission does not believe that it has the statutory mandate nor specialized experience appropriate to oversee it, or that Congress intended for the Commission to exercise its jurisdiction or expend its resources in this manner.**

Event Contracts, 89 Fed. Reg. 48,968, 48,982-48,983 (proposed June 10, 2024) (emphasis added).[12] As then-Commissioner, now-Acting Chair Caroline Pham forcefully argued in defense of preserving state gaming law, far from turning the CFTC into a nationwide gaming regulator, "the limits Congress placed on the Commission's regulation of event contracts *save* the Commission from becoming a gaming regulator." *Id.* at 48999. Commissioner Pham was correct: it is unreasonable to conclude that Congress intended to sideline well-established state regulations, without clearly saying so, and without providing for any federal gaming regulator to fill the vacuum.

In sum, none of Congress' drafting choices in the CEA amendments related to swaps are consistent with intending to displace well-settled state authority over gambling. *See Bond v. United States*, 572 U.S. 844, 858 (2014) ("[I]f the Federal Government would radically readjust the balance of state and national authority, those charged with the duty of legislating must be reasonably explicit about it.") (cleaned up). *See also West Virginia v. EPA*, 597 U.S. 697, 765 (2022) (court must use "common sense as to the manner in which Congress is likely to delegate" authority).

---

[12] This commentary related to a proposed rule that would have imposed a new definition of "gaming," to include "the staking or risking by any person of something of value upon," *inter alia*, "the outcome of a game in which one or more athletes compete." *Id.* at 48975. That rule would have even more clearly outlawed Kalshi's sports event contracts, but by supplanting, rather than deferring to, state gaming law— and was never adopted.

### ii. The CEA does not conflict-preempt Connecticut from regulating sports wagering.

Connecticut law governing sports wagers does not conflict with the CEA, under either an impossibility analysis or an obstacle analysis.

Conflict preemption occurs only where "compliance with both federal and state regulations is a physical impossibility" or where "the challenged state law stands as an obstacle to the accomplishment and execution of the full purpose and objectives of Congress." *Arizona v. United States*, 567 U.S. 387, 399 (2012) (cleaned up). "Federal law does not preempt state law under conflict preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *Art & Antique Dealers League of Am., Inc. v. Seggos*, 121 F.4th 423, 436 (2d Cir. 2024) (cleaned up).

First, it is obviously possible for Kalshi to comply with state and federal law. It can stop offering sports event contracts. No federal law requires Kalshi to offer them. Ceasing such activity would moot the issues in this suit and presumably the others Kalshi has filed or invited, eliminating any state-by-state "patchwork" concerns [ECF 30-1 at 21]. Kalshi's reluctance to give up a massive revenue source does not make it "physically impossible." *See Seggos*, 121 F.4th at 436 (rejecting argument that state "restriction on intrastate sales could make [business] much less profitable").

Kalshi's claim that following Connecticut's applicable wagering laws, such as those prohibiting gaming by minors, would impair its "impartiality" and subject it to enforcement by CFTC [ECF 30-1 at 21], is unsupportable. The CFTC has described the "impartiality" principle as preventing "using discriminatory access requirements [based on net worth] as a competitive tool against certain participants." Core Principles and

27

Other Requirements for Designated Contract Markets, 75 Fed. Reg. 80,572, 80,579 & n.51 (proposed Dec. 22, 2010). This guards against arbitrary financial barriers to entry; it does not require DCMs to offer all imaginable event contracts to all comers for the sake of it. Kalshi also fails to identify any risk of liability arising from a theoretical violation. It identifies no instance where the CFTC acted against a DCM simply for trying to comply with state law, or even suggested it might do so. On the contrary, CFTC staff have urged registered entities to *prepare* for state regulatory compliance and enforcement efforts. Exhibit D 2. Kalshi's claim to fear exposure under the "impartiality" rule is also hollow because, as discussed, Kalshi is already partial when it wants to be. P. 18, *supra*. Kalshi fails to explain why, if it can single out teams and league employees from trading, it is impossibly discriminatory to exclude those under the age of 21 or others as required.

Second, Kalshi fails to demonstrate that Connecticut gaming law poses any obstacle to federal objectives. "[P]reemption cannot be based on a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives," *Kansas v. Garcia*, 589 U.S. 191, 202 (2020) (cleaned up), or a mere "hypothetical or potential conflict," *Rice v. Norman Williams Co.*, 458 U.S. 654, 659 (1982).

Even assuming that Kalshi's sports event contracts are swaps for purposes of the CEA, state law touching on swaps is not evidence of a conflict with the CEA. An entity can be subject to multiple regulatory schemes, even overlapping ones. "The mere fact that state laws…overlap to some degree with federal criminal provisions does not even begin to make a case for conflict preemption." *Kansas*, 589 U.S. at 211. "Indeed, in the vast majority of cases where federal and state laws overlap, allowing the States to

prosecute [state offenses] is entirely consistent with federal interests." *Id.* at 212. Here, the federal regulator has *banned* the conduct that the State law seeks to address. In 17 C.F.R. § 40.11, pursuant to an express delegation of authority from Congress, the CFTC expressly outlawed contracts on conduct "that involves, relates to, or references… gaming, or an activity that is unlawful under any State or Federal Law," 17 C.F.R. § 40.11(a)(1), or activity that is similar thereto, *id.* § 40.11(a)(2), leaving no doubt that Kalshi's conduct is unlawful under the very scheme Kalshi claims protects it.

And there would be no conflict even if the CFTC had not expressly outlawed Kalshi's conduct. As discussed *supra* at pp. 9-10, the federal objectives behind federal commodities regulation include standardization, stability, and prevention of unlawful and abusive conduct in the nation's derivatives markets, while Dodd-Frank specifically concerned itself with ensuring the integrity and accountability of the marketplace for swaps. Connecticut gaming law is harmonious with those objectives. It targets unlawful gaming, just as the Special Rule anticipated. It confines sports wagering to State-licensed marketplaces, just as the CEA does for legitimate derivatives. And it ensures the integrity of legal sports wagering transactions and protects market participants from abuse. Rather than conflict, these objectives neatly dovetail together.

CFTC officials have recognized that state gaming regulation can comfortably coexist with federal law. As then-Commissioner Pham argued, "[s]tate regulation of gaming, ranging from betting to lotteries, is long-established in the U.S., and is clearly a power reserved to the States." Event Contracts, 89 Fed. Reg. at 48,999. "[I]t is essential that the CFTC does not encroach upon the prerogatives of States." *Id.* Consistent with this view, CFTC staff in Letter 2025-36 cited, without disagreement, the *Martin* court's

holding that the CEA "does not preempt the application of State gambling, wagering, and gaming laws to sports-related event contracts listed and traded on a CFTC-registered trading venue." Exhibit D 2.

In sum, there is no conflict between Connecticut's gaming laws and the objectives behind the CEA. It is not a purpose of the CEA that sports wagering be offered to all comers indiscriminately. It *is* a purpose of the CEA that markets be secure and stable and protect participants, which is just what Connecticut law does. Kalshi cannot show that Connecticut law does anything but support federal objectives here.

## II. Kalshi has not shown it is likely to suffer irreparable harm absent a preliminary injunction.

Kalshi fails to show that it will suffer irreparable harm without an injunction because any potential harm is speculative, and, if it occurs, will be of its own making.

First, Kalshi fails to show "that absent a preliminary injunction [it] will suffer an injury that is neither remote nor speculative, but actual and imminent," *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009)*; see also Jumpp v. McKenzie*, No. 24-cv-1931 (VDO), 2025 U.S. Dist. LEXIS 36528, at *5 (D. Conn. Feb. 25, 2025) ("Speculative, remote, or otherwise uncertain risk of future injury is not the province of injunctive relief"). Kalshi does not show an actual likelihood of imminent harm flowing from any potential DCP action.

As an initial matter, while Kalshi claims to fear criminal penalties, no defendant has independent criminal jurisdiction to enforce the gambling laws implicated here, so there is no direct risk of imminent criminal prosecution from any defendant's conduct.

Kalshi fails to show that administrative or civil action related to sports event contracts will harm it irreparably, let alone "existentially," as it claims [ECF 30-1 at 24]. It

already lost its bid to preempt Nevada's regulators in October 2025 in *Hendrick II*. That

has not deterred Kalshi, which claimed in December that it is "taking over" America,

touting its $11 billion valuation. https://perma.cc/HBA2-NMDY. Similarly, Kalshi's

competitor Crypto.com reportedly has ceased offering event contracts in Nevada and at

least seven other states, evidently without existential harm. Tom Nightingale,

*Crypto.com pulls sports contracts in several states amid pushback,* SBC Americas (Dec.

16, 2025) https://tinyurl.com/4py9x4vk. Given the real-world evidence that ceasing

offering sports event contracts in certain states is feasible, the Court need not credit

Kalshi's doomsday speculation. *See Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112,

115 (2d Cir. 2005) (affirming denial of preliminary injunction where record did not show

"compliance with…[s]tatutes pending trial would force Plaintiffs out of business, or

would fundamentally change the nature of their operations").

Kalshi's claims of financial harm from complying with state law, such as having to

hire a contractor to implement a geofencing system to identify and block Connecticut

residents [No. 30-5 ¶ 12 *et seq.*] are largely complaints about compliance costs, which

courts properly reject. *See Freedom Holdings, Inc.* 408 F.3d at 115 ("ordinary

compliance costs are typically insufficient to constitute irreparable harm"). And, since no

injunction protects Kalshi in Nevada, one assumes that Kalshi is already taking similar

steps to comply with Nevada law so that it would not bear the same costs anew

specifically because of DCP action.

Kalshi again speculates that if it complies with Connecticut law, the CFTC "could"

seek to revoke its designation as a DCM. [ECF 30-1 at 24; 30-5 ¶¶ 38-45.] This is based

on the false premise that DCP demands that Kalshi "abruptly end[] its business in

Connecticut" altogether [ECF 30-1 at 31]. *See* n.5, *supra*. In any event, as discussed, there is no basis to conclude that CFTC will take irremediable regulatory action against DCMs for complying with state law. The opposite appears to be true: CFTC staff have *urged* Kalshi to prepare for state enforcement action, including having "risk mitigation and contingency plans in place to deal with any developments that may affect customer, market participant, or clearing member positions and funds." Exhibit D 2. Nowhere in the CFTC staff letter is Kalshi urged to stiff-arm state regulators indefinitely, come what may.

Kalshi's claims of reputational harm or loss of goodwill absent an injunction are also farfetched at best. Kalshi has offered sports contracts for about a year. Nearly that entire time, it has been in litigation over those contracts (most of which it filed), and Kalshi and its competitors and partners have received multiple court decisions clearly articulating to the public why they are not exempt from state law. Against this backdrop of nationwide litigation activity, and evident CFTC skepticism, no new enforcement action by DCP could meaningfully impact Kalshi's reputation as it relates to sports event contracts. *See Robinhood*, 2025 U.S. Dist. LEXIS 231144, at *10-11 ("Robinhood's customers are on notice that offering gaming contracts is contrary to the CFTC's regulation at 17 C.F.R. § 40.11(a) and that the legal landscape under which Kalshi and Robinhood have been operating could change"). The same is true for Kalshi's claims of harm to other commercial partnerships; no commercial partner can legitimately fear new and different risks arising from a potential Connecticut enforcement action at this point.

Kalshi's claims that its users, and even the commodity markets themselves, may be impacted absent an injunction are equally dubious. [ECF 30-5 ¶¶ 29-35]. Even if

Kalshi provided facts, instead of catastrophic speculation, to support these claims, this is not a basis for the Court to conclude that *Kalshi* will be irreparably harmed. Whether third parties are harmed absent an injunction goes instead to the public interest factor. *Fairfield Cnty. Med. Ass'n v. United Healthcare of New Eng.*, No. 3:13-cv-1621 (SRU), 2013 U.S. Dist. LEXIS 173691, at *5 (D. Conn. Dec. 8, 2013).

Finally, Kalshi does not enjoy a presumption of irreparable harm based on an alleged "violation of constitutional rights" [ECF 30-1 at 22]. An alleged Supremacy Clause violation is not akin to the deprivation of a core personal liberty right that might trigger such a presumption. *See Chan v. U.S. DOT*, No. 23-cv-10365, 2024 U.S. Dist. LEXIS 231658, at *155-56 (S.D.N.Y. Dec. 23, 2024) (noting Second Circuit courts' refusal to presume irreparable harm over violations of "provisions of the Constitution that serve structural purposes"); *see also Barrett v. Harwood*, 967 F. Supp. 744, 746-47 (N.D.N.Y. 1997) (rejecting presumption where plaintiff alleged due process violation over vehicle repossession, but not infringement of speech, association, or privacy rights).

<u>Second</u>, Kalshi, not Defendants, is the primary cause of any possible harm Kalshi may suffer absent an injunction. "[S]elf-inflicted harm can be fatal to a motion for a preliminary injunction." *Bristol Tech., Inc. v. Microsoft Corp.*, 42 F. Supp. 2d 153, 162 (D. Conn. 1998). As the Nevada District Court observed, "Kalshi is, in some sense, proceeding at its own risk and creating its own harms." *Hendrick I*, 2025 U.S. Dist. LEXIS 67832, at *24. That Kalshi may now experience legal ramifications that regulators have warned about for nearly a year does not amount to irreparable harm that the Court should help Kalshi avoid.

Kalshi knew it was taking a major gamble and exposing itself to state liability on January 22, 2025, when it first self-certified that its sports event contracts complied with federal law [ECF 1 ¶ 43]. Just weeks earlier, Kalshi had argued to a federal court that those same contracts were *not* genuine swaps under the CEA and, by implication, not covered by any preemption. Kalshi's (accurate) interpretation of the law was confirmed, at the absolute latest, in March 2025 when it began receiving cease-and-desist letters from state regulators. *See e.g. Hendrick I*, 2025 U.S. Dist. LEXIS 67832, at *2-3 (referring to March 4 cease and desist letter from Nevada); *Flaherty*, 2025 U.S. Dist. LEXIS 79893, at *6 (March 27 letter from New Jersey). Since then, federal courts held four times that sports event contracts do not enjoy federal preemption. Finally, in September, CFTC staff issued their advisory warning of, and urging preparation for, state regulatory action. Notwithstanding these red flags, Kalshi barreled ahead.

For the same reason, Kalshi's claims that this Court's denial of its Motion will cause significant new costs and expenses are not credible. Kalshi had clear notice that it likely needed to begin implementing measures to comply with state law like Connecticut's. In particular, Kalshi's claim that it will now take six months from December 2025 to contract with a vendor to provide geofencing services [ECF 30-5 ¶ 22] simply should not be credited. If Kalshi had begun these efforts in January 2025 when it began offering sports event contracts—after having just asserted they had no place in the federally regulated derivatives markets—or in August 2025 when the *Martin* court denied its injunction motion, or in September 2025 when the CFTC warned it to prepare for state regulatory action, or in November 2025 when the Nevada court dissolved its injunction, Kalshi could have been well on its way to compliance.

34

## III. The public interest weighs against granting a preliminary injunction.

The public interest weighs heavily against enjoining Defendants. "When the government is a party to the suit, our inquiries into the public interest and the balance of the equities merge." *We The Patriots USA, Inc. v. Hochul*, 17 F.4th 266, 295 (2d Cir. 2021). Kalshi's unlicensed sports wagering threatens the public interest in having a highly regulated sports wagering industry and endangers revenue for programs alleviating the societal harms from sports wagering.

<u>First</u>, the public has a significant interest in enforcement of laws and regulations that protect the public, specifically minors, from problem gambling and predatory advertising. Gambling is a potentially harmful "vice activity," and states have an interest in reducing "the social costs associated with" it, *Greater New Orleans Broad. Ass'n, Inc. v. United States*, 527 U.S. 173, 182, 185 (1999), to promote the "welfare, safety, and morals" of their citizens. *Artichoke Joe's Cal. Grand Casino v. Norton*, 353 F.3d 712, 737 (9th Cir. 2003). Kalshi disregards the State's consumer protection safeguards, such as prohibitions against minors participating in, or receiving targeted advertising about, sports wagering. *See* pp. 5-7, *supra*. Kalshi admits it allows anyone over the age of 18 to trade sports event contracts. [ECF 30-1 at 21.] Kalshi even invited Connecticut college students directly to trade on its platform, including a "Kalshi Ambassador Program" targeted at Yale University, among other colleges. *See* Brian Pempus, *Sports Betting Site Kalshi Seeks 'Ambassadors' On College Campuses*, GamblingHarm.org (Sept. 19, 2025), https://perma.cc/Y2QU-23M3 (quoting text of Kalshi ad). The public's interest in deterring predatory marketing targeted at Connecticut's youth is at its peak due to the clear risks to youths and others from sports betting. *See* Antonio Pequeno IV, *Sports Gambling, Prediction Markets Could Lead to New Credit Risks for Young Men*

35

*and Low Earners, Bank Warns*, Forbes (Nov. 25, 2025) (Exhibit G) (detailing rising and widespread credit impacts of widespread sports wagering on young adults and others).

Connecticut prohibits gaming advertisements that guarantee social, financial, or personal success. Conn. Gen. Stat. § 12-863(e)(11). Meanwhile, Kalshi and its new partner, Coinbase, deceptively market these sports wagers as a "valuable financial tool" where individuals can use their "knowledge as an asset" and react in real time by "locking in gains or cutting losses as the odds move." *See* Mem. of Law iso Pl's. Mot. For Prelim. Inj. [ECF 5-1], *Coinbase Financial Markets, Inc. v. Tong*, No. 3:25-cv-02121 at 6 (describing sports event contracts as financial tools); Coinbase Prediction Markets, https://tinyurl.com/wezb435r (Exhibit H) (advertising using "knowledge as an asset" and to lock in gains or cut losses). This is precisely the type of deceptive marketing Connecticut sought to prohibit through its restrictive gaming advertising laws.

Connecticut also requires wagering licensees to maintain problem gambling prevention tools such as self-exclusion options and self-spending limitations. Pp. 6-7, *supra*. Connecticut has a strong public interest in enforcing these requirements. *See* Gemini Research, *Impacts of Legalized Gambling in Connecticut Report*, commissioned by the Connecticut Department of Mental Health and Addiction Services (January 2024) (excerpts attached as Exhibit I) at 71 (conservatively estimating 146,502 people in Connecticut with gambling related problems or "at-risk" of experiencing them). There is no evidence Kalshi complies with these requirements, and if Defendants are enjoined, Kalshi would not do so, as its sole incentive is to increase trades and therefore its own transaction fees. *How Does Kalshi Make Money?* Kalshi, https://perma.cc/B9XU-VLA4.

Second, the public has an interest in the revenue received from licensed sports wagering and the benefits therefrom. Connecticut's licensees must pay 13.75% of the gross gaming revenue from sports wagering, totaling more than $25 million in 2025. Conn. Gen. Stat. § 12-867(a)(1); Gaming Revenue, Statistics and Documents, DCP, https://perma.cc/PP5L-52EJ. A portion of this revenue goes directly to a Connecticut youth sports grant account. Conn. Gen. Stat. § 12-867(a)(2). Each of Connecticut's master wagering licensees must also contribute $500,000 yearly towards problem gambling programs. Conn. Gen. Stat. § 12-871. If Defendants are enjoined, Kalshi will continue to siphon away revenue supporting these vital programs.

Kalshi argues that Connecticut users will suffer harm if it is made to unwind its ongoing event contracts. Kalshi has been aware of the potential for state enforcement against its sports event contracts since it began offering them. *See* p. 34, *supra*. If it was genuinely concerned about a risk to users, it would have heeded the CFTC staff advisory and disclosed the potential of state regulatory action, including possibility of voiding of wagers. *See* Exhibit D. As of this filing, Defendants are not aware of Kalshi providing any such disclosures to its users. *See FAQ*, Kalshi, https://perma.cc/76N4-39WU (claiming Kalshi can legally provide sports related event contracts because it is "subject to federal – not state – laws and regulations"). Kalshi's own refusal to warn its users does not tip the balance of equities in its favor.

## IV.     Kalshi should be required to post a bond.

Under Rule 65(c), the Court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." If the Court grants the Motion, it should require a bond of not less than $250,000. This

amount is reasonable under the circumstances on two separate bases. One, it is equal to the application fee for an "online gaming operator," which a gaming operator seeking to comply with Connecticut law must pay, Conn. Gen. Stat. § 12-857(a). And two, it is far below the amount of civil penalties the State would be entitled to recover from Kalshi under CUTPA. A willful CUTPA violation (one where the defendant "knew or should have known that his conduct was a violation of [CUTPA]") carries a maximum penalty of $5,000 per violation, Conn. Gen. Stat. § 42-110o, such as, at a minimum, each day on which the conduct occurred. Kalshi has offered unlawful sports wagers since January 22, 2025, meaning that as of the date of this filing, it has offered sports event contracts on 352 separate days. A $250,000 bond representing only 50 days of violations is more than reasonable.

## CONCLUSION

The Court should deny Kalshi's Motion for the reasons set forth herein.

Respectfully submitted,

**DEFENDANTS**

BRYAN T. CAFFERELLI,
KRISTOFER GILMAN,
CONNECTICUT DEPARTMENT OF
CONSUMER PROTECTION,
WILLIAM TONG

**WILLIAM TONG**
**ATTORNEY GENERAL**

BY: */s/      Joseph E. Gasser*
Joseph E. Gasser, No. ct30299
Michael Nunes, No. ct31522
Assistant Attorneys General
Office of the Attorney General
165 Capitol Avenue
Hartford, CT 06106
Phone: 860-808-5400
Fax: 860-808-5593
joseph.gasser@ct.gov
michael.nunes@ct.gov