# Exhibit F

# WHETHER PROPOSALS BY ILLINOIS AND NEW YORK TO USE THE INTERNET AND OUT-OF-STATE TRANSACTION PROCESSORS TO SELL LOTTERY TICKETS TO IN-STATE ADULTS VIOLATE THE WIRE ACT

*Interstate transmissions of wire communications that do not relate to a "sporting event or contest" fall outside the reach of the Wire Act.*

*Because the proposed New York and Illinois lottery proposals do not involve wagering on sporting events or contests, the Wire Act does not prohibit them.*

September 20, 2011

## MEMORANDUM OPINION FOR THE
## ASSISTANT ATTORNEY GENERAL, CRIMINAL DIVISION

You have asked for our opinion regarding the lawfulness of proposals by Illinois and New York to use the Internet and out-of-state transaction processors to sell lottery tickets to in-state adults. *See* Memorandum for David Barron, Acting Assistant Attorney General, Office of Legal Counsel, from Lanny A. Breuer, Assistant Attorney General, Criminal Division (July 12, 2010) ("Crim. Mem."); Memorandum for Jonathan Goldman Cedarbaum, Acting Assistant Attorney General, Office of Legal Counsel, from Lanny A. Breuer, Assistant Attorney General, Criminal Division (Oct. 8, 2010) ("Crim. Supp. Mem."). You have explained that, in the Criminal Division's view, the Wire Act, 18 U.S.C. § 1084 (2006), may prohibit States from conducting in-state lottery transactions via the Internet if the transmissions over the Internet during the transaction cross State lines, and may also limit States' abilities to transmit lottery data to out-of-state transaction processors. You further observe, however, that so interpreted, the Wire Act may conflict with the Unlawful Internet Gambling Enforcement Act ("UIGEA"), 31 U.S.C. §§ 5361-5367 (2006), because UIGEA appears to permit intermediate out-of-state routing of electronic data associated with lawful lottery transactions that otherwise occur in-state. In light of this apparent conflict, you have asked whether the Wire Act and UIGEA prohibit a state-run lottery from using the Internet to sell tickets to in-state adults where the transmission using the Internet crosses state lines, and whether these statutes prohibit a state lottery from transmitting lottery data associated with in-state ticket sales to an out-of-state transaction processor either during or after the purchasing process.

Having considered the Criminal Division's views, as well as letters from New York and Illinois to the Criminal Division that were attached to your opinion request,[1] we conclude that interstate transmissions of wire communications that do not relate to a "sporting event or contest," 18 U.S.C. § 1084(a), fall outside of the reach of the Wire Act. Because the proposed New York and Illinois lottery proposals do not involve wagering on sporting events or contests,

---

[1] *See* Letter for Portia Roberson, Director, Office of Intergovernmental Affairs, from William J. Murray, Deputy Director and General Counsel, New York Lottery (Dec. 4, 2009) ("N.Y. Letter"); Letter for Eric H. Holder, Jr., Attorney General of the United States, from Pat Quinn, Governor, State of Illinois (Dec. 11, 2009) ("Ill. Letter"); Letter for Bruce Ohr, Chief, Organized Crime and Racketeering Section, Criminal Division, from John W. McCaffrey, General Counsel, Illinois Department of Revenue (Mar. 10, 2010); Department of Revenue and Illinois Lottery, State of Illinois Internet Lottery Pilot Program (Mar. 10, 2010) ("Ill. White Paper").

the Wire Act does not, in our view, prohibit them. Given this conclusion, we have not found it necessary to address the Wire Act's interaction with UIGEA, or to analyze UIGEA in any other respect.

# I.

In December 2009, officials from the New York State Division of the Lottery and the Office of the Governor of the State of Illinois sought the Criminal Division's views regarding their plans to use the Internet and out-of-state transaction processors to sell lottery tickets to adults within their states. *See* Crim. Mem. at 1; Ill. Letter; N.Y. Letter. According to its letter to the Criminal Division, New York is finalizing construction of a new computerized system that will control the sale of lottery tickets to in-state customers. Most of the tickets will be printed at retail locations and delivered to customers over the counter, but some will be "virtual tickets electronically delivered over the Internet to computers or mobile phones located inside the State of New York." N.Y. Letter at 1. New York also notes that all transaction data in the new system will be routed from the customer's location in New York to the lottery's data centers in New York and Texas through networks controlled in Maryland and Nevada. *Id.* Illinois, for its part, plans to implement a pilot program to sell lottery tickets to adults over the Internet, with sales restricted by geolocation technology to "transactions initiated and received or otherwise made exclusively within the State of Illinois." Ill. Letter at 2 (citation and internal quotation marks omitted). Illinois characterizes its program as "an intrastate lottery, despite the fact that packets of data may intermediately be routed across state lines over the Internet." Ill. White Paper at 12 (italics omitted). Both States argue in their submissions to the Criminal Division that the Wire Act is inapplicable because it does not cover communications related to non-sports wagering, and that their proposed lotteries are lawful under UIGEA. *Id.* at 11-12; N.Y. Letter at 3.

In the Criminal Division's view, both the New York and Illinois Internet lottery proposals may violate the Wire Act. Crim. Mem. at 3. The Criminal Division notes that "[t]he Department has uniformly taken the position that the Wire Act is not limited to sports wagering and can be applied to other forms of interstate gambling." *Id.* at 3; *see also* Crim. Supp. Mem. at 1-2. The Division also explains that "the Department has consistently argued under the Wire Act that, even if the wire communication originates and terminates in the same state, the law's interstate commerce requirement is nevertheless satisfied if the wire crossed state lines at any point in the process." Crim. Mem. at 3; *see also* Crim. Supp. Mem. at 2. Taken together, these interpretations of the Wire Act "lead[] to the conclusion that the [Act] prohibits" states from "utiliz[ing] the Internet to transact bets or wagers," even if those bets or wagers originate and terminate within the state. Crim. Supp. Mem. at 2.

The Criminal Division further notes, however, that reading the Wire Act in this manner creates tension with UIGEA, which appears to permit out-of-state routing of data associated with in-state lottery transactions. Crim. Mem. at 4-5. UIGEA prohibits any person engaged in the business of betting or wagering from accepting any credit or funds from another person in connection with the latter's participation in "unlawful Internet gambling." 31 U.S.C. § 5363; *see* Crim. Mem. at 3. Under UIGEA, "unlawful Internet gambling" means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet" in a jurisdiction where applicable federal or state law makes such a bet illegal. 31 U.S.C. § 5362(10)(A). Critically, however, UIGEA specifies that "unlawful Internet

gambling" does not include bets "initiated and received or otherwise made exclusively within a single State," *id.* § 5362(10)(B), and expressly provides that "[t]he intermediate routing of electronic data shall not determine the location or locations in which a bet or wager is initiated, received, or otherwise made," *id.* § 5362(10)(E).

The Criminal Division is thus concerned that the Wire Act may criminalize conduct that UIGEA suggests is lawful. On the one hand, the Criminal Division believes that the New York and Illinois lottery plans violate the Wire Act because they will involve Internet transmissions that cross state lines or the transmission of lottery data to out-of-state transaction processors. Crim. Mem. at 4; Crim. Supp. Mem. at 2. On the other hand, the Division acknowledges that state-run intrastate lotteries are lawful and that UIGEA specifically provides that the kind of "intermediate routing" of lottery transaction data contemplated by New York and Illinois cannot in itself render a lottery transaction interstate. Crim. Supp. Mem. at 2; Crim. Mem. at 4-5. The Criminal Division further notes that the conclusion that the Wire Act prohibits state lotteries from making in-state sales over the Internet creates "a potential oddity of circumstances" in which "the use of interstate commerce," rather than simply supplying a jurisdictional hook for conduct that is already wrongful, would transform otherwise lawful activity—state-run in-state lottery transactions—into wrongful conduct under the Wire Act. Crim. Supp. Mem. at 2.[2]

In light of this tension, the Criminal Division asked this Office to provide an opinion addressing whether the Wire Act and UIGEA prohibit state-run lotteries from using the Internet to sell tickets to in-state adults (a) where the transmission over the Internet crosses state lines, or (b) where the lottery transmits lottery data across state lines to an out-of-state transaction processor. Crim. Mem. at 5; Crim. Supp. Mem. at 1.

## II.

The Criminal Division's conclusion that the New York and Illinois lottery proposals may be unlawful rests on the premise that the Wire Act prohibits interstate wire transmissions of gambling-related communications that do not involve "any sporting event or contest." *See* Crim. Mem. at 3; Crim. Supp. Mem. at 2. As noted above, both Illinois and New York dispute this premise, contending that the Wire Act prohibits only transmissions concerning sports-related wagering. *See* Ill. White Paper at 11-12; N.Y. Letter at 3; *see also In re Mastercard Int'l, Inc., Internet Gambling Litig.*, 132 F. Supp. 2d 468, 480 (E.D. La. 2001) ("[A] plain reading of the statutory language clearly requires that the object of the gambling be a sporting event or contest."), *aff'd*, 313 F.3d 257 (5th Cir. 2002). The sparse case law on this issue is divided. *Compare, e.g.*, *Mastercard*, 313 F.3d at 262-63 (holding that the Wire Act does not extend to non-sports wagering), *with United States v. Lombardo*, 639 F. Supp. 2d 1271, 1281 (D. Utah. 2007) (taking the opposite view), *and* Report and Recommendation of United States Magistrate Judge Regarding Gary Kaplan's Motion to Dismiss Counts 3-12, at 4-6, *United States v. Kaplan*, No. 06-CR-337CEJ (E.D. Mo. Mar. 20, 2008) (same).[3] We conclude that the Criminal

---

[2] State-run lotteries are exempt from many federal anti-gambling prohibitions. *See, e.g.*, 18 U.S.C. §§ 1307, 1953(b)(4) (2006).

[3] A New York court also found that subsection 1084(a) applied to gambling in the form of "virtual slots, blackjack, or roulette," but did so without analyzing the meaning of the "sporting event or contest" qualification. *See New York v. World Interactive Gaming Corp.*, 714 N.Y.S.2d 844, 847, 851-52 (N.Y. Sup. Ct. 1999).

Division's premise is incorrect and that the Wire Act prohibits only the transmission of communications related to bets or wagers on sporting events or contests.

The relevant portion of the Wire Act, subsection 1084(a), provides:

> Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest, or for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers, shall be fined under this title or imprisoned not more than two years, or both.

18 U.S.C. § 1084(a) (codifying Pub. L. No. 87-216, § 2, 75 Stat. 491 (1961)).[4]

This provision contains two broad clauses. The first bars anyone engaged in the business of betting or wagering from knowingly using a wire communication facility "for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest." *Id.* The second bars any such person from knowingly using a wire communication facility to transmit communications that entitle the recipient to "receive money or credit" either "as a result of bets or wagers" or "for information assisting in the placing of bets or wagers." *Id.*[5]

---

[4] The Wire Act defines "wire communication facility" as "any and all instrumentalities, personnel, and services (among other things, the receipt, forwarding, or delivery of communications) used or useful in the transmission of writings, signs, pictures, and sounds of all kinds by aid of wire, cable, or other like connection between the points of origin and reception of such transmission." 18 U.S.C. § 1081 (2006).

[5] The Criminal Division reads this second clause of subsection 1084(a) as if it were two separate clauses: the first prohibiting the use of a wire communication facility "for the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers," and the second prohibiting the use of a wire communication facility "for information assisting in the placing of bets or wagers." *See* Crim. Mem. at 3; Crim. Supp. Mem. at 1 n.1. We do not find this reading convincing. Under that reading, the latter clause would prohibit the "use[] [of] a wire communication facility . . . for information assisting in the placing of bets or wagers," but it is unclear what, if anything, "us[ing]" a wire communication facility "for information" would mean. This difficulty could be remedied by reading the phrase "the transmission of" into the statute. However, doing so would both add words to the text and make the last clause in subsection 1084(a)—prohibiting use of a wire facility "for [the transmission of] information assisting in the placing of bets or wagers"—overlap with the first part of subsection 1084(a), which prohibits using wire communications for "the transmission . . . of . . . information assisting in the placing of bets or wagers on any sporting event or contest." This redundancy counsels against the Criminal Division's reading. *See, e.g.*, *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) (invoking "rule against superfluities"). We believe the second half of subsection 1084(a) is better read as a single prohibition barring "the transmission of a wire communication which entitles the recipient *to receive money or credit* [*either*] as a result of bets or wagers[] *or* for information assisting in the placing of bets or wagers." 18 U.S.C. § 1084(a) (emphasis added). This reading avoids the illogic and redundancy of the first reading. It is also supported by the Wire Act's legislative history, which characterizes the second half of subsection 1084(a) as a provision that would prohibit "the transmission of wire communications which entitle the recipient to receive money as the result of betting or wagering," S. Rep. No. 87-588, at 2 (1961)—*not* as a set of two provisions that both would prohibit the transmission of wire communications entitling the recipients to receive money or credit as a result of bets or wagers *and* broadly bar the transmission of information assisting in the placing of bets or wagers. *See* H.R. Rep. No. 87-967, at 2 (1961) (subsection (a) "also prohibits the transmission of a wire communication which entitled the recipient to receive

Our question is whether the term "on any sporting event or contest" modifies each instance of "bets or wagers" in subsection 1084(a) or only the instance it directly follows. The second part of the first clause clearly prohibits a person who is engaged in the business of betting or wagering from knowingly using a wire communication facility to transmit "information assisting in the placing of bets or wagers on any sporting event or contest" in interstate or foreign commerce. *Id.* § 1084(a). It is less clear that the "sporting event or contest" limitation also applies to the first part of the first clause, prohibiting the use of a wire communication facility to transmit "bets or wagers" in interstate or foreign commerce, or to the second clause, prohibiting the transmission of a wire communication "which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers." *Id.* For the reasons set forth below, we conclude that both provisions are limited to bets or wagers on or wagering communications related to sporting events or contests. We begin by discussing the first part of the first clause, and then turn to the second clause.

A.

In our view, it is more natural to treat the phrase "on any sporting event or contest" in subsection 1084(a)'s first clause as modifying both "the transmission in interstate or foreign commerce of bets or wagers" and "information assisting in the placing of bets or wagers," rather than as modifying the latter phrase alone. The text itself can be read either way—it does not, for example, contain a comma after the first reference to "bets or wagers," which would have rendered our proposed reading significantly less plausible. By the same token, the text does not contain commas after *each* reference to "bets or wagers," which would have rendered our proposed reading that much more certain. *See* 18 U.S.C. § 1084(a) ("Whoever being engaged in the business of betting or wagering knowingly uses a wire communication facility for the transmission in interstate or foreign commerce of bets or wagers or information assisting in the placing of bets or wagers on any sporting event or contest . . . .").

Reading "on any sporting event or contest" to modify "the transmission . . . of bets or wagers" produces the more logical result. The text could be read to forbid the interstate or foreign transmission of bets and wagers of all kinds, including non-sports bets and wagers, while forbidding the transmission of information to assist only sports-related bets and wagers. But it is difficult to discern why Congress, having forbidden the transmission of *all* kinds of bets or wagers, would have wanted to prohibit only the transmission of information assisting in bets or wagers concerning sports, thereby effectively permitting covered persons to transmit information assisting in the placing of a large class of bets or wagers whose transmission was expressly forbidden by the clause's first part. *See id.*; *see also id.* § 1084(b) (providing exceptions for news reporting, and for transmissions of wagering information from one state where betting is legal to another state where betting is legal, both expressly relating to "sporting events or contests"). The more reasonable inference is that Congress intended the Wire Act's prohibitions to be parallel in scope, prohibiting the use of wire communication facilities to transmit both bets or wagers *and* betting or wagering information on sporting events or contests. Given that this interpretation is an equally plausible reading of the text and makes better sense of the statutory

---

money or credit as a result of a bet or wager or for information assisting in the placing of bets or wagers"), *reprinted in* 1961 U.S.C.C.A.N. 2631, 2632.

5

scheme, we believe it is the better reading of the first clause. *See Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 222 (2008) ("[O]ur construction . . . must, to the extent possible, ensure that the statutory scheme is coherent and consistent.").

The legislative history of subsection 1084(a) supports this conclusion. As originally proposed, subsection 1084(a) would have imposed criminal penalties on anyone who "leases, furnishes, or maintains any wire communication facility with intent that it be used for the transmission in interstate or foreign commerce of *bets or wagers, or information assisting in the placing of bets or wagers, on any sporting event or contest* . . . ." S. 1656, 87th Cong. § 2 (1961) (as introduced) (emphasis added). The commas around the phrase "or information assisting in the placing of bets or wagers" make clear that the phrase "on any sporting event or contest" modifies both "bets or wagers" and "information assisting in the placing of bets or wagers."

In redrafting subsection 1084(a), the Senate Judiciary Committee altered the provision's first clause, changing the class of covered persons and removing the commas after both references to "wagers," and added a second clause prohibiting transmissions relating to "money or credit" (which we discuss below in section II.B). The Senate Judiciary Committee Report noted that the purpose of this amendment was to limit the subsection's reach to persons engaged in the gambling business, and to expand its reach to include "money or credit" communications:

> The second amendment changes the language of the bill, as introduced (which prohibited the leasing, furnishing, or maintaining of wire communication facility with intent that it be used for the transmission in interstate or foreign commerce of bets or wagers), to prohibit the use of wire communication facility by persons engaged in the business of betting or wagering, in the belief that the individual user, engaged in the business of betting or wagering, is the person at whom the proposed legislation should be directed; and has further amended the bill to prohibit the transmission of wire communications which entitle the recipient to receive money as the result of betting or wagering which is designed to close another avenue utilized by gamblers for the conduct of their business.

S. Rep. No. 87-588, at 2 (1961). Nothing in the legislative history of this amendment suggests that, in deleting the commas around "or information assisting in the placing of bets or wagers" and adding subsection 1084(a)'s second clause, Congress intended to expand dramatically the scope of prohibited transmissions from "bets or wagers . . . on any sporting event or contest" to *all* "bets or wagers," or to introduce a counterintuitive disparity between the scope of the statute's prohibition on the transmission of bets or wagers and the scope of its prohibition on the transmission of information assisting in the placing of bets or wagers. *See also* 107 Cong. Rec. 13,901 (1961) (Explanation of S. 1656, Prohibiting Transmission of Bets by Wire Communications, submitted for the record by Sen. Eastland, Chairman, S. Judiciary Comm.) (describing Senate Judiciary Committee's two major amendments to S. 1656 without mentioning an expansion of prohibited wagering to reach non-sports wagering); *cf. Report of Proceedings: Hearing Before the S. Comm. on the Judiciary, Exec. Sess.*, 87th Cong. 55 (1961) ("Senate Judiciary Comm. Exec. Session") (statement of Byron R. White, Deputy Att'y Gen.) (the bill, as amended, "is aimed now at those who use the wire communication facility for the

transmission of bets or wagers in connection with a sporting event").[6]  Given that such changes would have significantly altered the scope of the statute, we think this absence of comment in the legislative history is significant.  *Cf. Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 468 (2001) ("Congress . . . does not, one might say, hide elephants in mouseholes.").

## B.

We likewise conclude that the phrase "on any sporting event or contest" modifies subsection 1084(a)'s second clause, which prohibits "the transmission of a wire communication which entitles the recipient to receive money or credit as a result of bets or wagers, or for information assisting in the placing of bets or wagers."  18 U.S.C. § 1084(a).  The qualifying phrase "on any sporting event or contest" does not appear in this clause.  But in our view, the references to "bets or wagers" in the second clause are best read as shorthand references to the "bets or wagers on any sporting event or contest" described in the first clause.

Although Congress could have made such an intent even clearer by writing "*such* bets or wagers" in the second clause, the text itself is consistent with our interpretation.  And the interpretation gains support from the fact that the phrase "in interstate and foreign commerce" is likewise omitted from the second clause, even though Congress presumably intended *all* the prohibitions in the Wire Act, including those in the second clause, to be limited to interstate or foreign (as opposed to intrastate) wire communications.  *See* Crim. Mem. at 3 (to violate the Wire Act, the wire communication must "cross[] state lines"); *see also*, *e.g.*, H.R. Rep. No. 87-967, at 1-2 ("The purpose of the bill is to . . . aid in the suppression of organized gambling activities by prohibiting the use of wire communication facilities which are or will be used for the transmission of bets or wagers and gambling information *in interstate and foreign commerce*.") (emphasis added), *reprinted in* 1961 U.S.C.C.A.N. at 2631.  This omission suggests that Congress used shortened phrases in the second clause to refer back to terms spelled out more completely in the first clause.

Reading the entire subsection, including its second clause, as limited to sports-related betting also makes functional sense of the statute.  *Cf. Corley v. United States*, 129 S. Ct. 1558, 1567 n.5 (2009) (construing the statute as a whole to avoid "the absurd results of a literal reading").  On this reading, all of subsection 1084(a)'s prohibitions serve the same end, forbidding wagering, information, and winnings transmissions of the same scope:  No person may send a wire communication that places a bet on a sporting event or entitles the sender to

---

[6] The legislative history indicates that the Department of Justice played a significant role in drafting S. 1656 as part of the Attorney General's program to fight organized crime and syndicated gambling.  *See, e.g.*, S. Rep. No. 87-588, at 3 (noting that S. 1656 was introduced by the committee chairman on the recommendation of the Attorney General); *The Attorney General's Program to Curb Organized Crime and Racketeering: Hearings on S. 1653, S. 1654, S. 1655, S. 1656, S. 1657, S. 1658, S. 1665 Before the S. Comm. on the Judiciary*, 87th Cong. 12 (1961) ("Senate Hearings") (statement of Robert F. Kennedy, Att'y Gen.) ("We have drafted this statute carefully to protect the freedom of the press."), *quoted in* S. Rep. No. 87-588, at 3; Senate Judiciary Comm. Exec. Session at 54-55 (statement of Byron R. White, Deputy Att'y Gen.) (describing amendments to S. 1656 negotiated by the Justice Department); *Legislation Relating to Organized Crime: Hearings on H.R. 468, H.R. 1246, H.R. 3021, H.R. 3022, H.R. 3023, H.R. 3246, H.R. 5230, H.R. 6571, H.R. 6572, H.R. 6909, H.R. 7039 Before Subcomm. No. 5 of the H. Comm. on the Judiciary*, 87th Cong. 5 (1961) ("House Hearings") (statement of Rep. McCulloch) (referring to "the legislative proposals of the Kennedy administration").

receive money or credit as a result of a sports-related bet, and no person may send a wire communication that shares information assisting in the placing of a sports-related bet or entitles the sender to money or credit for sharing information that assisted in the placing of a sports-related bet.

Reading subsection 1084(a) to contain some prohibitions that apply solely to sports-related gambling activities and other prohibitions that apply to all gambling activities, in contrast, would create a counterintuitive patchwork of prohibitions. If the provision's second clause is read to apply to *all* bets or wagers, subsection 1084(a) as a whole would prohibit using a wire communication facility to place bets or to provide betting information only when sports wagering is involved, but would prohibit using a wire communication facility to transmit *any and all* money or credit communications involving wagering, whether sports-related or not. We think it is unlikely that Congress would have intended to permit wire transmissions of non-sports bets and wagers, but prohibit wire transmissions through which the recipients of those communications would become entitled to receive money or credit as a result of those bets. We think it similarly unlikely that Congress would have intended to allow the transmission of information assisting in the placing of bets or wagers on non-sporting events, but then prohibit transmissions entitling the recipient to receive money or credit for the provision of information assisting in the placing of those lawfully-transmitted bets.

The legislative history of subsection 1084(a) supports our reading of the text. *Cf. Pub. Citizen v. U.S. Dep't of Justice*, 491 U.S. 440, 454 (1989) ("Where the literal reading of a statutory term would 'compel an odd result,' we must search for other evidence of congressional intent to lend the term its proper scope.") (quoting *Green v. Bock Laundry Mach. Co.*, 490 U.S. 504, 509 (1989)); *cf. Green*, 490 U.S. at 527 (Scalia, J., concurring) (finding it "entirely appropriate to consult all public materials, including the background of [Federal] Rule [of Evidence] 609(a)(1) and the legislative history of its adoption, to verify that what seems to us an unthinkable disposition . . . was indeed unthought of, and thus to justify a departure from the ordinary meaning of the word 'defendant' in the Rule"). To begin, when Congress revised the Wire Act during the legislative process to add the second clause, it indicated (as noted above) that its purpose in doing so was to "further amend[] the bill to prohibit the transmission of wire communications which entitle the recipient to receive money as the result of betting or wagering[,] which is designed to close another avenue utilized by gamblers for the conduct of their business." S. Rep. No. 87-588, at 2. There is no indication that Congress intended the prohibition on money or credit transmissions to sweep substantially more broadly than the underlying prohibitions on betting, wagering, and information communications, let alone any discussion of any rationale behind such a counterintuitive scheme. *Cf. Am. Trucking*, 531 U.S. at 468.

More broadly, the Wire Act's legislative history reveals that Congress's overriding goal in the Act was to stop the use of wire communications for sports gambling in particular. Congress was principally focused on off-track betting on horse races, but also expressed concern about other sports-related events or contests, such as baseball, basketball, football, and boxing. The House Judiciary Committee Report, for example, explains:

> Testimony before your Committee on the Judiciary revealed that modern bookmaking depends in large measure on the rapid transmission of gambling information by wire communication facilities. For example, at present, the immediate receipt of information as to results of a horserace permits a bettor to place a wager on a successive race. Likewise, bookmakers are dependent upon telephone service for the placing of bets and for layoff betting on all sporting events. The availability of wire communication facilities affords opportunity for the making of bets or wagers and the exchange of related information almost to the very minute that a particular sporting event begins.

H.R. Rep. No. 87-967 at 2, *reprinted in* 1961 U.S.C.C.A.N. at 2631-32 (reprinted report entitled "Sporting Events—Transmission of Bets, Wagers, and Related Information"); *see also* 107 Cong. Rec. 16,533 (1961) (statement of Rep. Celler, Chairman, H. Judiciary Comm.) ("This particular bill involves the transmission of wagers or bets and layoffs on horseracing and other sporting events."); House Hearings at 24-26 (statement of Robert F. Kennedy, Att'y Gen.) (describing horse racing bookmaking operations and the importance to the bookmaker of rapid inbound and outbound communications); House Hearings at 236-38 (statement of Frank D. O'Connor, District Attorney, Long Island City, N.Y.) (describing the operation of the Delaware Sports Service, a wire service that enables bookies and gambling syndicates to lay off horse race bets with other bookies, reduce odds on a horse, and even cheat by taking bets after a race has finished).

Legislative history from the Senate similarly suggests that Congress's motive in enacting the Wire Act was to combat sports-related betting. The Explanation of S. 1656, Prohibiting Transmission of Bets by Wire Communications, provided by Chairman Eastland during the Senate debate, describes the problem addressed by the legislation this way:

> Information essential to gambling must be readily and quickly available. Illegal bookmaking depends upon races at about 20 major racetracks throughout the country, only a few of which are in operation at any one time. Since the bookmaker needs many bets in order to operate a successful book, he needs replays, including money on each race. Bettors will bet on successive races only if they know quickly the results of the prior race and the bookmaker cannot accept bets without the knowledge of the results of each race. Thus, information so quickly received as to be almost simultaneous, prior to, during, and immediately after each race with regard to starting horse, scratches of entries, probable winners, betting odds, results and the prices paid, is essential to both the illegal bookmaker and his customers.

107 Cong. Rec. 13,901 (1961); *see also* S. Rep. No. 87-588, at 4 (quoting Letter for Vice President, U.S. Senate, from Robert F. Kennedy, Att'y Gen. (Apr. 6, 1961)); Senate Hearings at 12 (statement of Robert F. Kennedy, Att'y Gen.) ("The people who will be affected [by S. 1656] are the bookmakers and the layoff men, who need incoming and outgoing wire communications in order to operate.").

Although Congress was most concerned about horse racing, testimony during the hearings also highlighted the increasing importance of rapid wire communications to "large-scale betting operations" involving other professional and amateur sporting events, such as baseball, basketball, football, and boxing. House Hearings at 25 (statement of Robert F. Kennedy, Att'y Gen.). The Attorney General testified, for instance, that recent disclosures revealed that gamblers had bribed college basketball players to shave points on games, and that up-to-the-minute information regarding "the latest 'line' on the contest," "late injuries to key players," and the like was critical to bookmakers. *Id.*; *accord* Senate Hearings at 6 (statement of Robert F. Kennedy, Att'y Gen.); *see also* House Hearings at 272 (statement of Nathan Skolnik, N.Y. Comm'n of Investigation) (bookmakers handling illegal baseball, basketball, football, hockey, and boxing wagering need wire communications to obtain "the line," to make layoff bets, and to receive race results); *id.* at 298-99 (statement of Dan F. Hazen, Assistant Vice President, W. Union Tel. Co.) (discussing baseball-sports ticker installations refused or removed by Western Union because of illegal use). This focus on sports-related betting makes sense, as the record before Congress indicated that sports bookmaking was the principal gambling activity for which crime syndicates were using wire communications at the time. *See* Charles P. Ciaccio, Jr., *Internet Gambling: Recent Developments and State of the Law*, 25 Berkeley Tech. L.J. 529, 537 (2010); *see also* Senate Hearings at 277-78 (testimony of Herbert Miller, Assistant Attorney General, Criminal Division).[7]

Our conclusion that subsection 1084(a) is limited to sports betting finds additional support in the fact that, on the same day Congress enacted the Wire Act, it also passed another statute in which it expressly addressed types of gambling other than sports

---

[7] As noted above, the Justice Department played a key role in drafting S. 1656, and it understood the bill to reach only the use of wire communications for sports-related wagering and communications. The colloquy between Mr. Miller and Senator Kefauver, chairman of a committee that held hearings to investigate organized crime and gambling in the 1950s, underscores that Congress was well aware of that understanding:

> SENATOR KEFAUVER. The bill [S. 1656] on page 2 seems to be limited to sporting events or contests. Why do you not apply the bill to any kind of gambling activities, numbers rackets, and so forth?
>
> MR. MILLER. Primarily for this reason, Senator: The type of gambling that a telephone is indispensable to is wagers on a sporting event or contest. Now, as a practical matter, your numbers game does not require the utilization of communications facilities.
>
> . . . .
>
> SENATOR KEFAUVER. I can see that telephones would be used in sporting contests, and it is used quite substantially in the numbers games, too.
>
> How about laying off bets by the use of telephones and laying off bets in bigtime gambling? Does that not happen sometimes?
>
> MR. MILLER. We can see that this statute will cover it. Oh, you mean gambling on other than a sporting event or contest?
>
> SENATOR KEFAUVER. Yes.
>
> MR. MILLER. This bill, of course, would not cover that because it is limited to sporting events or contests.

Senate Hearings at 277-78.

gambling, including gambling known as the "numbers racket," which involved lottery-style games. In addressing these forms of gambling, Congress used terms wholly different from those employed in the Wire Act. For example, the Interstate Transportation of Wagering Paraphernalia Act, Pub. L. No. 87-218, 75 Stat. 492 (1961) (codified at 18 U.S.C. § 1953), specifically prohibits the interstate transportation of wagering paraphernalia, including materials used in lottery-style games such as numbers, policy, and bolita.[8] Subject to exemptions, the statute provides, in part:

> Whoever, except a common carrier in the usual course of its business, knowingly carries or sends in interstate or foreign commerce any record, paraphernalia, ticket, certificate, bills, slip, token, paper, writing, or other device used, or to be used, or adapted, devised, or designed for use in (a) bookmaking; or (b) wagering pools with respect to a sporting event; or (c) in a numbers, policy, bolita, or similar game shall be fined under this title or imprisoned for not more than five years or both.

18 U.S.C. § 1953(a) (2006). The legislative history indicates that the reference to "a numbers, policy, bolita, or similar game" under subpart (c) of this provision was intended to cover lotteries. *See* H.R. Rep. No. 87-968, at 2 (1961), *reprinted in* 1961 U.S.C.C.A.N. 2634, 2635; *see also* House Hearings at 29-30 (1961) (statement of Robert F. Kennedy, Att'y Gen.) (highlighting the need for legislation prohibiting the interstate transportation of wagering paraphernalia to help suppress "lottery traffic" and to close loopholes created by judicial decisions).

Congress thus expressly distinguished these lottery games from "bookmaking" or "wagering pools with respect to a sporting event," and made explicit that the Interstate Transportation of Wagering Paraphernalia Act applied to all three forms of gambling. 18 U.S.C. § 1953(a).[9] Congress's decision to expressly regulate lottery-style games in addition to sports-related gambling in that statute, but not in the contemporaneous Wire Act, further suggests that Congress did not intend to reach non-sports wagering in the Wire Act. *See Dooley v. Korean Air Lines Co.*, 524 U.S. 116, 124 (1998) (construing one federal statute in light of another congressional enactment the same year).[10]

---

[8] As Assistant Attorney General Herbert Miller explained, "numbers, policy, and bolita[] are similar types of lotteries wherein an individual purchases a ticket with a number." House Hearings at 350; *see generally* National Institute of Law Enforcement and Criminal Justice, United States Department of Justice, *The Development of the Law of Gambling: 1776-1976*, at 748-52 (1977) (describing the numbers game and lotteries).

[9] The Supreme Court later held that 18 U.S.C. § 1953 barred the interstate transportation of records, papers, and writings in connection with a sweepstake race operated by the state of New Hampshire. *United States v. Fabrizio*, 385 U.S. 263, 266-70 (1966). In 1975, Congress amended the statute to exempt "equipment, tickets, or materials used or designed for use within a State in a lottery conducted by that State acting under authority of State law," Pub. L. No. 93-583, § 3, 88 Stat. 1916 (1975) (codified at 18 U.S.C. § 1953(b)(4)), and established a new provision, 18 U.S.C. § 1307, exempting state-conducted lotteries from statutory restrictions governing lotteries in 18 U.S.C. §§ 1301-1304, Pub. L. No. 93-583, § 1, 88 Stat. 1916 (1975). No similar exemption for state lotteries was added to the Wire Act.

[10] The legislative history of the Wire Act does contain numerous references to "gambling information." However, in context, this term is best read as a reference to the specific kinds of gambling information covered by the statute being discussed, not evidence of an independent intent to include other kinds of gambling information

In sum, the text of the Wire Act and the relevant legislative materials support our conclusion that the Act's prohibitions relate solely to sports-related gambling activities in interstate and foreign commerce.[11]

### III.

What remains for resolution is only whether the lotteries proposed by New York and Illinois involve "sporting event[s] or contest[s]" within the meaning of the Wire Act. We conclude that they do not. The ordinary meaning of the phrase "sporting event or contest" does not encompass lotteries. As noted above, a statute enacted the same day as the Wire Act expressly distinguished sports betting from other forms of gambling, including lotteries. *See supra* pp. 10-11 (discussing § 1953(e)). Other federal statutes regulating lotteries make the same distinction. *See* 18 U.S.C. § 1307(d) (2006) ("'Lottery' does not include the placing or accepting of bets or wagers on sporting events or contests.").[12] Nothing in the materials supplied by the

---

within the scope of the statute—let alone an intent to include that other kind of information *only* with respect to money or credit communications. *See, e.g.*, H.R. Rep. No. 87-967, at 3 (citing the exemption in subsection 1084(b) for the transmission of "gambling information" from "a State where the placing of bets and wagers on a sporting event is legal, to a State where betting on that particular event is legal," even though subsection 1084(b) does not refer to "gambling information"), *reprinted in* 1961 U.S.C.C.A.N. at 2632; House Hearings at 353-54 (referring, in discussing H.R. 7039, 87th Cong. (1961), to "[o]ur purpose [being] to prohibit the interstate transmission of gambling information which is essential to the gambling fraternity," even though H.R. 7039 did not refer to "gambling information" but would have prohibited the transmission of wagers and wagering information only with respect to a "sporting event or contest").

We further note that the Wire Act itself uses the term "gambling information" in subsection 1084(d). *See* 18 U.S.C. § 1084(d) ("When any common carrier, subject to the jurisdiction of the Federal Communications Commission, is notified in writing by a Federal, State, or local law enforcement agency, acting within its jurisdiction, that any facility furnished by it is being used or will be used for the purpose of transmitting or receiving *gambling information* in interstate or foreign commerce in violation of Federal, State or local law, it shall discontinue or refuse, the leasing, furnishing, or maintaining of such facility, after reasonable notice to the subscriber . . . .") (emphasis added). We express no opinion about the scope of that term as it is used in that statutory provision.

[11] We also considered the possibility that, in the Wire Act's reference to "any sporting event or contest," 18 U.S.C. § 1084(a), the word "sporting" modifies only "event" and not "contest," such that the provision would bar the wire transmission of "wagers on any sporting event or [any] contest." This interpretation would give independent meaning to "event" and "contest," but it would also create redundancy of its own. If Congress had intended to cover *any* contest, it is unclear why it would have needed to mention sporting events separately. Moreover, as discussed above, the legislative history of the Wire Act makes clear that Congress was focused on preventing the use of wire communications for sports gambling in particular. And, legislative proposals from the 1950s in which the phrase "any sporting event or contest" originated further confirm that Congress intended to reach only "sporting contests." A key debate at that time concerned whether to regulate "any sporting event or contest" or "any horse or dog racing event or contest." *See, e.g.*, S. Rep. No. 81-1752, at 3, 22, 28 (1950) (explaining committee amendment to bill narrowing the definition of "gambling information" from covering "any sporting event or contest" to "any horse or dog racing event or contest"); *compare* S. 3358, 81st Cong. § 2(b) (1950) (as introduced), *with* S. 3358, 81st Cong. § 2(b) (1950) (as reported by the Interstate and Foreign Commerce Committee). If Congress had intended the Wire Act's predecessors to reach *any* "contest," however, the debate over which adjectival phrase to apply to "event" would have been meaningless.

[12] In addition, the Professional and Amateur Sports Protection Act ("PASPA") prohibits a governmental entity from sponsoring, operating, or authorizing by law "a lottery, sweepstakes, or other betting, gambling, or wagering scheme based, directly or indirectly . . . on one or more competitive games in which amateur or

Criminal Division suggests that the New York or Illinois lottery plans involve sports wagering, rather than garden-variety lotteries. Accordingly, we conclude that the proposed lotteries are not within the prohibitions of the Wire Act.

Given that the Wire Act does not reach interstate transmissions of wire communications that do not relate to a "sporting event or contest," and that the state-run lotteries proposed by New York and Illinois do not involve sporting events or contests, we conclude that the Wire Act does not prohibit the lotteries described in these proposals. In light of that conclusion, we need not consider how to reconcile the Wire Act with UIGEA, because the Wire Act does not apply in this situation. Accordingly, we express no view about the proper interpretation or scope of UIGEA.

/s/

VIRGINIA A. SEITZ
Assistant Attorney General

---

professional athletes participate, or are intended to participate, or on one or more performances of such athletes in such games." 28 U.S.C. § 3702 (2006). While the statute grandfathers some established state gambling schemes, a new state lottery falling within the Act's prohibitions would not be exempt. *Id.* § 3704; *see, e.g.*, *OFC Comm Baseball v. Markell*, 579 F.3d 293, 300-04 (3d Cir. 2009) (PASPA preempted aspects of Delaware statute permitting wagering on athletic contests, which were not saved by any of the statutory exceptions).