# UNITED STATES DISTRICT COURT
# DISTRICT OF CONNECTICUT

| | |
|---|---|
| KALSHIEX LLC, | Civil Action No.: 3:25-cv-02016-VDO |
| *Plaintiff*, | |
| vs. | |
| BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG in his official capacity as Attorney General of Connecticut, | |
| *Defendant*s. | JANUARY 30, 2026 |

## PLAINTIFF'S REPLY IN SUPPORT OF ITS
## MOTION FOR PRELIMINARY INJUNCTION

**ORAL ARGUMENT
REQUESTED**

I.  **KALSHI IS LIKELY TO SUCCEED ON THE MERITS**.

   A.  **Kalshi's Contracts Are Swaps or Other CFTC-Regulated Derivatives**.

To begin, the CEA bars states from second-guessing whether instruments traded on a DCM qualify as swaps or other derivatives. Kalshi's contracts undisputedly trade on a DCM, and the CFTC has exclusive authority to regulate them under the CEA. If states could regulate *on-DCM* trades by claiming that they are not derivatives, states could "directly affect trading on or the operation of a futures market"—which Congress "preempted." *Am. Agric. Movement, Inc. v. Bd. of Trade of Chi.*, 977 F.2d 1147, 1156–57 (7th Cir. 1992); *see Big Lagoon Rancheria v. California*, 789 F.3d 947, 954 (9th Cir. 2015) (collateral attack on agency decision would be prohibited "end-run"). This does not mean (as Defendants argue at 14-15) that this Court cannot interpret the CEA. It simply means that a challenge to the CFTC's determination must be brought against the CFTC itself.

A swap is a contract that "provides" for payment based on the occurrence "of an event or contingency associated with a potential financial, economic, or commercial consequence." 7 U.S.C. § 1a(47)(A)(ii). "Associated" means "connect[ed]." *See Associated*, Oxford English Dictionary (3d ed. 2011). A swap thus requires an event connected to a potential financial, economic, or commercial consequence. Kalshi's sports contracts fit easily within this definition; they have financial consequences for team sponsors, advertisers, television networks, local communities, and more. They also have financial consequences for sportsbooks, some of which have used Kalshi's contracts to hedge their risks.[1] Defendants' arguments to the contrary fail.

*First*, Defendants are wrong (at 15–16) that an "outcome" is not an "event" or "contingency" that may underlie a swap. Dictionaries define "event" to mean "outcome." *Event*,

---

[1] Brett Smiley, *Underdog Sports Preparing to Use Kalshi, Prediction Markets For Its Own Risk Management*, InGame (Oct. 22, 2025), https://perma.cc/BT4A-BK8T.

1

Random House Webster's Unabridged Dictionary (2d ed. 2001). While Defendants assert (at 16 n.9) that some dictionaries treat "outcome" as outside the "standard" definition, most do not. "Event" also means "a thing that happens," as Defendants concede (at 16 n.9). *E.g.*, *Event*, Random House Webster's Pocket American Dictionary (5th ed. 2008). President Trump winning the 2024 presidential election was an outcome, but also undeniably an event. And "contingency" includes "something liable to happen as an adjunct to or result of something else." *Contingency*, Merriam-Webster's Collegiate Dictionary (11th ed. 2003). That definition easily encompasses outcomes. Defendants' argument would contravene this Court's precedent recognizing that "event" means "outcome." *Prysmian Cables & Sys. USA LLC v. ADT Com. LLC*, 665 F. Supp. 3d 236, 246 (D. Conn. 2023); *see also Pub. Serv. Co. of Colo. v. Cont'l Cas. Co.*, 26 F.3d 1508, 1514–15 (10th Cir. 1994) (similar); *KalshiEX v. CFTC*, 2024 WL 4164694, at *1 (D.D.C. Sep. 12, 2024) ("event contracts" are "based on the outcome of a contingent event"). It would also contravene the CFTC's longstanding view that event contracts may be based on "outcome[s]." 73 Fed. Reg. 25,669, 25,669–70 (May 7, 2008). And it would pose intractable interpretive difficulties, because almost any event can be recharacterized as an outcome of a different event.

*Second*, Defendants are wrong (at 17–18) that sports events are not "associated with" potential financial consequences. Sports events have *actual* and *significant* financial consequences. They readily meet the swap definition, which requires only *potential* consequences. Defendants' assertion (at 17) that player performance lacks consequences for anyone other than the player ignores reality—player performance affects sponsors, advertisers, and franchises. *See* Compl. ¶ 28. Recognizing this problem, Defendants argue (at 17) that events lack an "inherent" connection with financial consequences. But the CEA does not require "inherent[]" consequences; it requires "potential" consequences, effectively the opposite of inherent. Defendants' argument

2

is especially untenable given that they seek to bar *all* Kalshi sports contracts, requiring them to make an impossible showing that *no* sports events are associated with financial consequences.[2]

*Third*, contrary to Defendants' claim (at 11, 28–29), the CFTC clearly recognizes sports contracts subject to its jurisdiction. As the CFTC Chairman recently noted, "event contracts," including "sports-related contracts," have been "within the CFTC's regulatory perimeter" for decades and are subject to its "exclusive jurisdiction." Decl. of Andrew Porter ("Porter Decl.") Ex. 6. Defendants rely on a 2024 CFTC *proposed* rule, but the rule was never adopted, and the Chairman recently ordered the agency to "withdraw" it. *Id.* The Chairman further "directed CFTC staff to reassess" CFTC participation "in matters currently pending before the federal district and circuit courts" because "[w]here jurisdictional questions are at issue, the Commission has the expertise and responsibility to defend its exclusive jurisdiction." *Id.* And while Defendants cite a CFTC advisory (at 11, 34, 37), the Chairman directed its withdrawal as well. Here, the CFTC has exercised its jurisdiction, demanding that Kalshi demonstrate compliance with the CEA for its initial sports event contracts. Kalshi did so (Porter Decl. Exs. 3–4), and the CFTC determined that no further action was necessary.

*Fourth*, Defendants are wrong (at 18–19) that treating sports-event contracts as swaps would lead to the "absurd" result of requiring all sports betting to occur on DCMs. As Defendants concede (at 10), the CEA contains a savings clause clarifying that, except as provided by the CFTC's exclusive jurisdiction over *on-DCM* trading, "nothing" in the remainder of Section 2 shall "restrict" state authorities "from carrying out their duties and responsibilities in accordance with [state] laws." 7 U.S.C. § 2(a); *see id.* § 16(e)(1)(B)(i). Further, the CFTC has made clear that

---

[2] Defendants also misrepresent Kalshi's comments in a prior litigation (at 1-2, 17-18, 22). Those statements did not concern whether sports contracts are swaps—it was undisputed they were—but instead whether they would be subject to the Special Rule. And Kalshi clarified that "there may be some games that do have extrinsic consequences." Porter Decl. Ex. 5 at 74:15-16.

3

"consumer and commercial transactions" that "are *not traded on an organized market*" are not swaps. 77 Fed. Reg. 48,208, 48,247 (Aug. 13, 2012) (emphasis added). Thus, nothing in the CEA prevents state authorities from regulating sportsbooks.

*Fifth,* Defendants suggest (at 19–21) that Kalshi's position would impliedly repeal several federal statutes. Not so. Four years before Dodd-Frank, Congress enacted UIGEA to prohibit the use of the internet to facilitate certain bets and wagers unlawful under state law, while making clear that the term "bet or wager" "does not include" "any transaction conducted on" a DCM. 31 U.S.C. § 5362(1)(E)(ii). UIGEA confirms Congress's understanding that *on-DCM* transactions fall outside federal gambling statutes like IGRA and the Wire Act. *See Bob Jones Univ. v. United States*, 461 U.S. 574, 587 n.10 (1983) (later statutes are "entitled to great weight" in resolving the meaning of undefined terms in prior statutes on the same subject matter). Rather than effecting an implied repeal, Kalshi's interpretation comports with the duty to reconcile federal statutes that "are capable of co-existence." *Traynor v. Turnage*, 485 U.S. 535, 548 (1988) (citation omitted); *Blue Lake Rancheria v. Kalshi Inc.*, 2025 WL 3141202 (N.D. Cal. Nov. 10, 2025) (rejecting IGRA-based challenge to Kalshi's offerings on these grounds). Defendants cite PASPA, but that law was fully consistent with the CEA's preemption of state gambling laws as to on-DCM trades.

*Finally*, setting aside whether Kalshi's contracts are swaps, they are "future[s]" or "option[s]" in excluded commodities, which are subject to exclusive CFTC jurisdiction. 7 U.S.C. § 2(a)(1)(A). The events underlying Kalshi's contracts are "excluded commodities" because they are an "occurrence" or "contingency" that is "beyond the control of the parties" and "associated with" a financial consequence. *Id.* § 1a(19)(iv)(I). Courts have therefore concluded that event contracts "are subject to regulation under the CEA as 'excluded commodities.'" *KalshiEX*, 2024 WL 4164694, at *2; *CFTC v. Trade Exch. Network Ltd.*, 117 F. Supp. 3d 29, 37–38 (D.D.C. 2015)

4

(rejecting argument that event contracts "did not involve a 'commodity' regulated under the CEA").

### B. The CEA Preempts Connecticut's Gaming Laws as Applied to Kalshi.

**Express Preemption:**  Defendants invoke a presumption against preemption, but where a statute "contains an express pre-emption clause, [courts] do not invoke any presumption." *Puerto Rico v. Franklin Cal. Tax-free Tr.*, 579 U.S. 115, 125 (2016).  Defendants argue (at 23) the presumption applies because states generally regulate gambling, but the Sixth Circuit recently rejected this argument, explaining that since "regulation of *interstate* gambling isn't a traditional area of state regulation," a "presumption against preemption doesn't apply." *Churchill Downs Tech. Initiatives Co. v. Mich. Gaming Control Bd.*, 162 F.4th 631, 640–41 n.5 (6th Cir. 2025).

**Field Preemption:**  Mountains of evidence confirm that Congress preempted the field of regulating trading on DCMs.  Congress gave the CFTC "exclusive jurisdiction" over transactions on DCMs.  7 U.S.C. § 2(a)(1)(A).  Congress intended to "preempt the field." H.R. Rep. No. 93-1383, at 35 (1974).  Congress defined the "jurisdiction of states" to *exclude* the right to regulate DCMs.  *See* 7 U.S.C. § 13a-2(1).  For 50 years, courts have concluded that "the CEA preempts the application of state law." *Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980); *United States v. Brien*, 617 F.2d 299, 310 (1st Cir. 1980) (CFTC occupies "the entire field of commodities futures regulation"); *Am. Agric.*, 977 F.2d at 1156–57 (state laws that "would directly affect trading on or the operation of a futures market" are "preempted"); *FTC v. Ken Roberts Co.*, 276 F.3d 583, 591 (D.C. Cir. 2001) (CFTC jurisdiction is "exclusive with regard to the trading of futures *on organized contract markets*") (citation omitted).  The CFTC agrees that, "due to federal preemption, event contracts never violate state law when they are traded on a DCM." Appellant Br. at *27, *KalshiEX LLC v. CFTC*, 2024 WL 4512583 (D.C. Cir. Oct. 16, 2024).

Defendants ask this Court to rewrite the CEA to make the CFTC's jurisdiction exclusive

5

*except for state gambling laws*. But "it is not the job of judges to effectively rewrite the statute" based on assumptions about Congress's unstated purposes. *United States v. Bedi*, 15 F.4th 222, 229 (2d Cir. 2021). And history refutes Defendants' assertion (at 21–22) that Congress did not intend to preempt state gambling laws. Before the CEA, many states regulated *all* futures trading as unlawful "gambling in grain." *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933); *see* Kalshi Br. at A1-16, *KalshiEX LLC v. Martin*, No. 25-1892 (4th Cir.) (listing dozens of pre-CEA state laws regulating futures trading as a type of gambling). Defendants insist (at 12 n.5) that they target only Kalshi's sports contracts, but do not dispute (at 5) that their definition of gambling—which "criminalizes" risking "any" "thing of value for gain contingent in whole or in part upon lot," Conn. Gen. Stat. § 53-278a(2)–(3)—would allow states to regulate *all* event contracts or even *all* futures contracts as gambling. That is a radical proposition at odds with a half-century of precedent, and Defendants' efforts to defend it all fail.

*First*, the savings clause cited by Defendants (at 10) includes a proviso making clear that state law applies "[e]xcept as provided" by the CFTC's exclusive jurisdiction over on-DCM trading. 7 U.S.C. § 2(a)(1)(A). Congress added that proviso to reject the result Defendants urge this court to accept. *See* S. Rep. No. 93-1131, at 6 (1974) (adding the proviso to ensure "the Commission's jurisdiction, where applicable, supersedes State as well as Federal agencies").

*Second*, Defendants invoke (at 24–25) 7 U.S.C. § 16, but it supports Kalshi. Section 16(e)(1) provides that the CEA shall *not* "supersede or preempt" state law as to transactions "*not* conducted on" a DCM. 7 U.S.C. § 16(e)(1) (emphasis added). The only coherent inference of specifying no preemption as to *off-DCM* transactions is that Congress did intend preemption as to *on-DCM* transactions. Congress then enacted Section 16(e)(2) to preempt states from applying their gaming laws to transactions *exempted* from the CEA's on-DCM requirement, just as states

6

were already preempted from applying state laws to *on-DCM* transactions. *See* H.R. Rep. No. 106-711, pt. 2, at 71 (2000) (the "current" CEA already "supersedes and preempts" state laws as to *on-DCM* transactions, and Section 16(e)(2) clarified that it "supersedes and preempts State gaming and bucket shop laws" as to exempt transactions as well). Each of the transactions cross-referenced in Section 16(e)(2) *need not occur on DCMs*, which is why Congress specified preemption. And Section 16(h) bars states from regulating *all* swaps as insurance, including swaps traded over the counter that wouldn't otherwise fall within the CFTC's exclusive jurisdiction.

*Third*, Defendants invoke the Special Rule, but it is fatal to their position. While Defendants contend (at 14–15) that "gaming" contracts fall outside the CFTC's jurisdiction, the Special Rule provides that contracts involving "gaming" are indeed "event contracts" subject to CFTC jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). Defendants claim (at 24–25) "Congress expressly wove [state law]" into the Special Rule. But the statute's text allows only "*the Commission*"—not 50 different states—to prohibit contracts involving activity that violates state or federal law. *Id.*

*Fourth*, Defendants claim (at 29) that a CFTC regulation is an outright "ban[]" on sports contracts, but this too is incorrect. *See* 17 C.F.R. § 40.11. While subsection (a) prohibits contracts involving enumerated categories, subsection (c) permits the CFTC to review such contracts on a case-by-case basis. *See id.* § 40.11(c). The CFTC has recognized as much. *See* 76 Fed. Reg. 44,776, 44,785–86 (July 27, 2011) (DCMs "may always" self-certify contracts, and Section 40.11 allows review "on a case-by-case basis"); 89 Fed. Reg. at 48,970–71 (CFTC interprets the Special Rule "to contemplate that the Commission engage in a two-step inquiry" rather than a blanket ban). Even if it were a blanket ban, it would not help Defendants; it would be grounds for a CFTC

7

enforcement action but would not open the door to state regulation.[3]

**Conflict Preemption:** Compliance with Connecticut law is impossible for Kalshi. Defendants' suggestion (at 28–30) that Kalshi could comply by obtaining a license ignores that Connecticut law allows regulators to issue only three "master wagering licenses," and all three have already been issued. Conn. Agencies Regs. § 12-865-4 (2022); Conn. Gen. Stat. §§ 12-852–53. Connecticut also requires that individuals be physically located within the state to place wagers, Conn. Gen. Stat. § 12-863—this is impossible for Kalshi, which operates a nationwide DCM that must offer impartial access. While Defendants claim (at 27) Kalshi could "stop offering sports event contracts," the Supreme Court has rejected an identical argument, noting that "if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption would be all but meaningless." *Mut. Pharm. Co., Inc. v. Bartlett*, 570 U.S. 472, 488 (2013).

Connecticut law is also preempted because it "would directly affect trading on or the operation of a futures market," *Am. Agric.*, 977 F.2d at 1156–57, which Defendants do not dispute. The CEA seeks "to prescribe uniform standards." *Armour & Co. v. Ball*, 468 F.2d 76, 83 (6th Cir. 1972). Courts easily find conflict preemption where state-by-state regulation is "at odds with the goal of uniformity that Congress" intended. *Ingersoll-Rand Co. v. McClendon*, 498 U.S. 133, 142 (1990); *see Barclays Cap. Inc. v. Theflyonthewall.com, Inc.*, 650 F.3d 876, 897 (2d Cir. 2011). Defendants respond (at 28) that Kalshi already imposes some limits on who may trade on its markets, but the key point is that Kalshi applies these restrictions *nationwide*, not state-by-state.

---

[3] Defendants cite (at 21–22) statements made in 2010 by Senator Lincoln, but these statements support Kalshi, as they recognize that the Special Rule would restore "the CFTC's" authority to regulate gaming contracts. 156 Cong. Rec. S5902, S5906 (July 15, 2010). As Senator Lincoln informed the Third Circuit, "Congress intended for the CFTC alone to make that determination." Members of Congress Br. at 16, *KalshiEX LLC v. Flaherty*, No. 25-1922 (3d Cir.). Defendants also rely on comments by a former CFTC commissioner urging the CFTC to adopt a proposal to bar sports contracts under the Special Rule (a proposal the Chairman has now repudiated). Those remarks underscore the CFTC's jurisdiction, because where "the CFTC has jurisdiction, its power is exclusive." *Chi. Mercantile Exch. v. SEC*, 883 F.2d 537, 548 (7th Cir. 1989).

8

Defendants' efforts to regulate Kalshi conflict with Congress's chosen "method of enforcement" in the Special Rule. *Arizona v. United States*, 567 U.S. 387, 406 (2012). Defendants claim (at 29) that state law is "harmonious" with the CEA because both seek at a high level of abstraction to advance the public interest. But 50 different states' understandings of the public interest will differ from the CFTC's view that "event contract markets" play an "important role" in the financial system. Porter Decl. Ex. 6. If 50 states could prosecute DCMs for offering contracts they deem contrary to the public interest, the CFTC's exclusive jurisdiction to make a public-interest judgment would be meaningless.

## II. KALSHI WILL SUFFER IRREPARABLE HARM WITHOUT A PI, AND THE BALANCE OF HARMS AND PUBLIC INTEREST FAVOR KALSHI.

Defendants' suggestion (at 30–33) that Kalshi's harm is "speculative" is meritless. Defendants threaten Kalshi with civil sanctions unless it ceases to operate in Connecticut. Compl. Ex. 1, at 2. If Kalshi does not comply, it will "expose [itself] to potentially huge liability." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381–82 (1992). And if Kalshi complies, it will "suffer the injury of obeying [state] law during the pendency of the proceedings." *Id*. Such a "Hobson's choice" is quintessential irreparable harm. *Id.*

Defendants do not dispute that geofencing would cost Kalshi tens of millions of dollars that it could not recoup even if it prevails. *United States v. New York*, 708 F.2d 92, 93 (2d Cir. 1983) (affirming finding that "[plaintiff's] injury was irreparable even though [its] losses were only pecuniary because a suit in federal court against [the defendant,] New York[,] to recover the damages sustained by [plaintiff] would be barred by the Eleventh Amendment"). Defendants suggest Kalshi is already geofencing, but that is false: Kalshi functions nationwide, and compliance with Defendants' demands would make Connecticut the only state where Kalshi does not operate uniformly. This in turn would subject Kalshi to a loss of business, impose competitive

9

harms relative to Kalshi's competitors, jeopardize Kalshi's compliance with the Core Principles, and create an obvious loss of goodwill on the part of Kalshi customers forced out of open positions—all clear irreparable harms. *Morales*, 504 U.S. at 381–82; *see* Decl. of Xavier Sottile ("Sottile Decl."), Dkt. No. 30-5 ¶¶ 18–19. While Defendants argue (at 32–33) that Kalshi cannot invoke harms to its users, the Second Circuit has held that harm "to the public" may be considered in weighing a preliminary injunction. *Long Island R.R. Co. v. Int'l Ass'n of Machinists*, 874 F.2d 901, 910 (2d Cir. 1989). And the Court can reject the assertion (at 33) that the mere existence of preemption litigation means Kalshi will not face harm or that its harms are somehow self-inflicted. In *every* preemption case, a party violates state law on the ground that federal law governs. Kalshi's conduct here was especially reasonable given that it relied on preliminary injunctions issued in April 2025.

Defendants claim (at 35–37) that enjoining the enforcement of preempted state laws would undermine the public interest. But Kalshi already undisputedly provides many of the same consumer-protection measures Defendants tout (at 35–36). And the Sixth Circuit rejected the same argument, noting "Michigan didn't lose its ability to regulate [other] gambling," and that it is "always in the public interest" to "enjoin[] the enforcement of a law that violates constitutional rights." *Churchill Downs*, 162 F.4th at 643.[4]

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiff's Motion for Preliminary Injunction.

---

[4] Defendants' request (at 37–38) for a $250,000 bond is unreasonable. Kalshi does not wish the bond amount to be a barrier to an injunction, but believes only a *de minimis* bond is warranted, particularly given the absence of non-speculative harm to Defendants if a PI issues. *Dr.'s Assocs., Inc. v. Stuart*, 85 F.3d 975, 985 (2d Cir. 1996).

10

Dated: January 30, 2026
Hartford, Connecticut

Respectfully submitted,

 /s/  *Vanessa Roberts Avery*
Vanessa Roberts Avery (ct21000)
**McCarter & English, LLP**
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6700
vavery@mccarter.com
Neal Katyal (admitted *pro hac vice*)
Joshua B. Sterling (admitted *pro hac vice*)
William E. Havemann (admitted *pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
JSterling@milbank.com
WHavemann@milbank.com

Grant R. Mainland (admitted *pro hac vice*)
Andrew L. Porter (admitted *pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com

*Attorneys for KalshiEX LLC*

**CERTIFICATE OF SERVICE**

      I hereby certify that on January 30, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated below. Parties may access this filing through the Court's CM/ECF System.

By:   */s/ Vanessa Roberts Avery*
       Vanessa Roberts Avery (ct21000)