**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| KALSHIEX LLC,<br><br>*Plaintiff*,<br><br>vs.<br><br>BRYAN T. CAFFERELLI, in his official capacity as Commissioner of the Connecticut Department of Consumer Protection; KRISTOFER GILMAN, in his official capacity as Director of Gaming for the Connecticut Department of Consumer Protection; CONNECTICUT DEPARTMENT OF CONSUMER PROTECTION; and WILLIAM TONG, in his official capacity as Attorney General of Connecticut,<br><br>*Defendant*s. | Civil Action No.: 3:25-cv-02016-VDO<br><br>AUGUST 13, 2026 |

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**PLAINTIFF'S MOTION FOR AN EMERGENCY INJUNCTION PENDING APPEAL**

## INTRODUCTION

Pursuant to Federal Rule of Civil Procedure 62(d), Plaintiff KalshiEX LLC ("Kalshi") respectfully submits this memorandum of law in support of its motion for an injunction pending appeal from this Court's Opinion and Memorandum denying Kalshi's motion for a preliminary injunction, Dkt. No. 94 (the "Op."), and, in the alternative, for short-term administrative relief pending the Second Circuit's resolution of Kalshi's forthcoming motion for an injunction pending appeal. Kalshi has appealed this Court's decision and now seeks interim relief to preserve the status quo during that appeal.[1]

This case presents complex legal questions that have divided courts across the country regarding whether the Commodity Exchange Act ("CEA") preempts state enforcement of gambling laws against designated contract markets ("DCMs"). As this Court noted, the only court of appeals to have reached the question ruled in Kalshi's favor, with the Third Circuit holding that the CEA "preempts state gambling laws that seek to regulate futures trading, i.e., Kalshi's sports-related event contracts traded on a DCM under the exclusive jurisdiction of the CFTC." *KalshiEX, LLC v. Flaherty*, 172 F.4th 220, 230 (3d Cir. 2026). In this Circuit, a movant for an injunction pending appeal "need only present a substantial case on the merits when a serious legal question is involved and show that the balance of the equities weighs heavily in favor of granting the stay." *LaRouche v. Kezer*, 20 F.3d 68, 72-73 (2d Cir. 1994) (citation modified). Kalshi respectfully submits that it satisfies that standard.

[1] Defendants have declined to agree to withhold enforcement pending resolution of this motion. If this Court does not grant Kalshi relief, Kalshi intends to seek an injunction pending appeal from the Second Circuit, which is already considering Kalshi's motion for an injunction pending appeal in a similar proceeding arising from New York's efforts to ban Kalshi's event contracts. *See KalshiEX v. Williams*, No. 26-1835 (2d Cir.). Given the risk of imminent state enforcement if Kalshi does not obtain relief, Kalshi intends to seek an injunction pending appeal from the Second Circuit on August 17, 2026 if this Court has not granted Kalshi relief by that time.

## ARGUMENT

### I. Kalshi's Appeal Raises Serious Questions That Have Divided the Courts.

Whether the CEA preempts state regulation of prediction markets is a question of first impression in the Second Circuit. The District of New Jersey and the Third Circuit sided with Kalshi in *Flaherty*; the Middle District of Tennessee and the District of Arizona granted preliminary injunctions in similar cases; and the District of Minnesota preliminarily enjoined enforcement of a state statute regulating prediction markets on the ground that Kalshi and the CFTC were likely to prove express preemption. *See Flaherty*, 172 F.4th at 231-32; *KalshiEX LLC v. Orgel*, 2026 WL 474869, at *11 (M.D. Tenn. Feb. 19, 2026); *KalshiEX LLC v. Johnson*, 2026 WL 1223373, at *9 (D. Ariz. May 5, 2026); *United States v. Minnesota*, 2026 WL 2150211, at *1 (D. Minn. July 27, 2026). The United States and the CFTC agree that the CEA preempts state regulation of DCMs and have sued multiple States—including Connecticut—to prevent them from applying gambling laws to sports-event contracts on DCMs.[2] Their suit against Connecticut is pending before this Court. *See* Compl., *United States v. Connecticut*, No. 26-cv-498 (D. Conn. Apr. 2, 2026), Dkt. No. 1 ("Conn. Compl."). Against that backdrop, a short-term injunction pending appeal is appropriate to maintain the status quo until the legal issues can be resolved by the Second Circuit. And while Kalshi acknowledges that this Court concluded that Kalshi was not entitled to a preliminary injunction, we respectfully submit that the Second Circuit may disagree with certain features of this Court's decision.

---

[2] *See also* Compl., *United States v. Arizona*, No. 26-cv-2246 (D. Ariz. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. Illinois*, No. 26-cv-3659 (N.D. Ill. Apr. 2, 2026), Dkt. No. 1; Compl., *United States v. New York*, No. 26-cv-3404 (S.D.N.Y. Apr. 24, 2026), Dkt. No. 1; Compl., *United States v. Wisconsin*, No. 26-cv-749 (E.D. Wis. Apr. 28, 2026), Dkt. No. 1; Compl., *United States v. New Mexico*, No. 26-cv-1912 (D.N.M. June 12, 2026), Dkt. No. 1; Compl., *United States v. Kentucky*, No. 26-cv-49 (E.D. Ky. June 23, 2026), Dkt. No. 1; Intervenor Compl., *KalshiEX LLC v. Furcolo*, No. 26-cv-327 (D.R.I. June 26, 2026), Dkt. No. 37.

*First*, the Second Circuit may disagree with this Court's holding that Kalshi's event contracts are not swaps. The Court concluded that the outcomes of sporting events and players' performances are categorically not associated with "potential financial, economic, or commercial consequences." Op. at 17-18 (quoting 7 U.S.C. § 1a(47)(A)(ii)). The Second Circuit could conclude otherwise, and could instead agree with the Third Circuit that the "outcome of a sports event certainly can be associated with a potential financial, economic, or commercial consequence." *Flaherty*, 172 F.4th at 230. As the CFTC put it, "[s]ports teams are economic enterprises . . . that generate economic activity and materially affect both regional and national markets" with "billions" of dollars at stake. *See* Prediction Markets; Public Interest Determinations, 91 Fed. Reg. 35,806, 35,807, 35,830 (proposed June 12, 2026) (to be codified at 17 C.F.R. pt. 40).

This Court's contrary holding rested on its conclusion that "the phrase 'associated with a potential financial, economic, or commercial consequences'" means "that the event or contingency, by its very nature, has embedded within it some potential financial, economic, or commercial consequence." Op. at 20. The Second Circuit could conclude that this interpretation adds limitations to the statute found nowhere in the text. The Second Circuit could further conclude that this interpretation raises intractable difficulties, because it is unclear what events by their "very nature" have potential economic consequences "embedded within" them. For example, the Court cited "advertising costs" as embedded within a sports game, but held that financial consequences for "sponsors" were not. Op. at 22. The Second Circuit could conclude that the statutory text provides no basis to draw such distinctions.

The Second Circuit could further disagree with this Court's conclusion that a limiting principle is needed to prevent the swap definition from being "effectively limitless." Op. at 21-

22. The Second Circuit could conclude that Congress intentionally chose to define "swap" broadly. *See Minnesota*, 2026 WL 2150211, at *12 (noting that ordinary meaning of the terms "associated with" and "potential" in the definition "reflects congressional intent to . . . cover many transactions and agreements"). But this definition is not limitless, and the statute's plain meaning excludes events without any prospect of financial consequences, subject to normal principles of causation. The Second Circuit could further conclude that Congress's express enumeration of exclusions from the swap definition, 7 U.S.C. § 1a(47)(B), and its decision to authorize the SEC and CFTC to enumerate further exclusions, 15 U.S.C. § 8302(d)(1), weigh heavily against adopting extratextual exclusions. And the Second Circuit could view it as highly relevant that the CFTC has proposed a regulation to permit some sports-event contracts while barring others, which alleviates any concern that offerings on DCMs will be limitless. *See* 91 Fed. Reg. at 35,808-09.

*Second*, the Second Circuit could disagree with this Court's conclusion that the CEA does not expressly preempt state law. The Court recognized that the CEA grants the CFTC "exclusive jurisdiction" over "transactions involving swaps" traded on DCMs, but nonetheless concluded that the CEA leaves room for state regulation of swaps traded on DCMs. Op. at 26–28. The Second Circuit could conclude that if Kalshi's contracts are swaps, and if the CFTC has exclusive jurisdiction over swaps, the CEA's plain text compels preemption: the "plain meaning of 'exclusive'" "necessarily denies jurisdiction" to entities not named in the provision. *Mississippi v. Louisiana*, 506 U.S. 73, 77-78 (1992); *see Leist v. Simplot*, 638 F.2d 283, 322 (2d Cir. 1980) (CEA "preempts the application of state law" regarding trading on federal exchanges); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 233 (1947) (statutory grant of "exclusive" "jurisdiction" to a federal agency preempted state law).

This Court held that state gambling laws were excluded from the CEA's preemptive scope.

But the Second Circuit could conclude that the text makes the CFTC's jurisdiction exclusive regardless of the type of state laws at issue. Indeed, a century ago some states barred all derivatives trading as "gambling in grain futures," *Dickson v. Uhlmann Grain Co.*, 288 U.S. 188, 198 (1933), making it especially unlikely that Congress intended to create a gambling-law exception to the CFTC's exclusive jurisdiction. While this Court held to the contrary by relying upon a presumption against preemption, Op. at 24-25, both the Supreme Court and Second Circuit have held that where a "statute contains an express pre-emption clause, [courts] do not invoke any presumption against pre-emption but instead focus on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent." *Puerto Rico v. Franklin Cal. Tax-Free Tr.*, 579 U.S. 115, 125 (2016) (citation modified); *see Buono v. Tyco Fire Prods., LP*, 78 F.4th 490, 495 (2d Cir. 2023) (same).[3]

*Third*, in rejecting field preemption, this Court cited various CEA provisions to conclude that the CFTC's exclusive jurisdiction does not preempt state regulation of swaps traded on DCMs. But the Second Circuit could find that each of these provisions supports preemption.

This Court relied on the savings clause in Section 2(a)(1)(A), but the Court omitted the proviso to that clause, which provides that state law is not superseded only "[e]xcept as hereinabove provided" by the CFTC's exclusive jurisdiction over on-DCM transactions. 7 U.S.C. § 2(a)(1)(A); *Flaherty*, 172 F.4th at 230-31. Congress added that proviso for the purpose of "clarifying" that "where applicable," the jurisdiction of the CFTC "supersedes State as well as Federal agencies." H.R. Rep. No. 93-1383, at 35 (1974). This Court also cited the Special Rule,

---

[3] The Second Circuit may also determine that no presumption against preemption applies here because derivatives trading on DCMs is an area "where there has been a history of significant federal presence." *N.Y. SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 104 (2d Cir. 2010) (citation omitted); *see Churchill Downs Tech. Initiatives Co. v. Mich. Gambling Control Bd.*, 162 F.4th 631, 641 n.5 (6th Cir. 2025) (presumption did not apply because "regulation of interstate gambling isn't a traditional area of state regulation").

but the Second Circuit could conclude that the Special Rule's reference to "[e]vent contracts" involving "gaming" as a type of "swap" is clear textual evidence that Congress understood contracts like Kalshi's sports-event contracts to fall within the CFTC's exclusive jurisdiction. 7 U.S.C. § 7a-2(c)(5)(C)(i). The Court maintained that the Special Rule reflected an intent to "*preserve* state laws," Op. at 26, but, quite the contrary, the Special Rule allows the CFTC—and only the CFTC—to determine that a contract is "contrary to the public interest" if it involves "gaming" or "unlawful" activity. *Id.*; *see Minnesota*, 2026 WL 2150211, at *13 (the Special Rule suggests "that Congress intended DCM-based transactions over these prediction markets to be governed by the CFTC"). Finally, this Court relied on the express preemption provisions in Section 16(e), but these provisions clarify that the CEA does not "supersede or preempt" state law regarding "any transaction . . . *that is not conducted on*" a DCM. 7 U.S.C. § 16(e)(1)(B) (emphasis added). They further preempt certain "exempted" *off-DCM* transactions—a provision Congress adopted only because the CEA already "supersede[d] and preempt[ed]" state laws "in the case of transactions conducted on" a DCM. H.R. Rep. No. 106-711, pt. 2, at 71 (2000). Thus, each of these provisions underscores that the CEA preempts the application of state law as to on-DCM transactions.

*Fourth*, regarding conflict preemption, the Second Circuit could disagree with the Court's view (Op. at 28-32) that Kalshi can comply with both regimes. Connecticut requires licensees to accept only in-state trades, Conn. Gen. Stat. § 12-863, while the CEA requires a DCM to provide "impartial access" to participants nationwide, 17 C.F.R. § 38.151(b). The CFTC has confirmed it is "impossible" for DCMs to adhere to state-by-state geographical limitations while complying with the CFTC's impartial-access command, Conn. Compl. ¶ 73, because doing so would fragment a single nationwide market into fifty liquidity pools with different prices for identical contracts—

a result antithetical to the CEA. *See* 7 U.S.C. § 5 (the CEA seeks to "serve the public interest[]" by regulating transactions that "are entered into regularly in interstate and international commerce" under CFTC "oversight"). The Court noted that it was "unclear why Kalshi could not seek out a license pursuant to Connecticut law," Op. at 30, but Connecticut law allows regulators to issue only three "master wagering licenses," and all three have already been issued, which only underscores the futility of attempting to secure a Connecticut license. *See* Conn. Agencies Regs. § 12-865-4 (2022); Conn. Gen. Stat. §§ 12-852–12-853. And while this Court suggested that sports-event contracts "appear[] to be unlawful" under 17 C.F.R. § 40.11, the CFTC has explained that it "has consistently applied § 40.11 to operate a discretionary review framework rather than a self-executing *per se* prohibition, because the opposite interpretation would violate the statute." 91 Fed. Reg. at 35,815. It has further noted that many sports-event contracts "can be operated consistent with the public interest" pursuant to "the structural protections outlined" in CFTC regulations. *Id.* at 35,836. Allowing states to ban contracts that the CFTC seeks to approve presents a clear conflict.

The conflict between state and federal law is not theoretical. After the New York Attorney General brought a state-court action against Kalshi seeking to bar its event contracts, the CFTC issued an order declaring a "market emergency" that "directs Kalshi to continue to operate its exchange in accordance with its normal practices" even if the state court orders Kalshi to stop operating. Christopher J. Kirkpatrick, CFTC, Order Directing Kalshi to Continue Exercising DCM Functions, at 1 (Aug. 11, 2026), https://perma.cc/DY95-8BNC. That order highlights the irreconcilable conflict between federal and state law—it literally requires Kalshi to refrain from following state law. It explains that "the threat of the sudden, unpredictable shut down of a DCM poses an existential threat to the Commission's registrants, marketplaces, and regulatory

jurisdiction," and that the use of a state's laws to halt trading on a nationwide exchange is "the antithesis of the structure that Congress designed." *Id.* at 4-5.

**II. Kalshi Faces Irreparable Harm Absent Relief.**

Absent relief, Kalshi faces irreparable harm no matter which course it takes: It must either disregard Defendants' enforcement demands and expose itself to civil and criminal liability, or comply and suffer unrecoverable economic and reputational injury.

*First*, if Kalshi does not acquiesce to Defendants' demands pending appeal, it faces civil and criminal liability under Connecticut's laws. *See* Conn. Gen. Stat. §§ 42-110a *et seq.*, 53-278b, 53-278d. The enforcement threat is imminent. The state's cease-and-desist letter directed Kalshi to immediately cease advertising and offering its contracts to Connecticut residents. Compl. Ex. 1, at 2, Dkt. No. 1-1. Under the parties' joint stipulation, Defendants agreed to forbear from enforcement only pending disposition of the preliminary-injunction motion (Dkt. No. 35). With that motion having been denied, the parties' stipulation no longer governs, and Defendants have pointedly declined to forbear enforcement pending the resolution of this motion, highlighting the imminent threat of enforcement.

*Second*, if Kalshi does comply with Connecticut's demands, doing so would cause "economic and reputational harm, including loss of business and goodwill." *Flaherty*, 172 F.4th at 231. Kalshi's only means of compliance during the appeal would be to terminate trading for tens of thousands of Connecticut users, many of whom have open investments on the platform. Decl. of Xavier Sottile ¶¶ 24, 47. There is no question that Kalshi will suffer significant monetary harm from this lost business, nor is there any question that it could not recoup those losses given Defendants' immunity from damages liability. *See NIH v. Am. Pub. Health Ass'n*, 145 S. Ct. 2658, 2659 (2025) (per curiam) ("loss of money" is "irreparable" if the funds "cannot be recouped"

(citation modified)). Further, the CFTC has emphasized that a DCM "cannot fulfill its federal mandate" if it complies with state-by-state restrictions, so complying with Connecticut's demands would place Kalshi out of compliance with its federal obligations and jeopardize its status as a CFTC-approved DCM. *See* Amicus Br. of CFTC at 26-27, *N. Am. Derivatives Exch., Inc. v. Nevada*, No. 25-7187 (9th Cir. Feb. 17, 2026); 17 C.F.R. § 38.151(b). While this Court deemed it "speculative" that the CFTC would take action against Kalshi, Op. at 35, the CFTC has now issued an emergency order forbidding Kalshi from following state law in a neighboring state. It is therefore not at all speculative that Kalshi could be forced either to comply with state law even though doing so violates a federal order, or else to comply with federal law and face liability and contempt proceedings—all as the Second Circuit evaluates whether those state laws are preempted.

## III. The Remaining Equitable Factors Favor Relief.

The balance of equities and the public interest favor an injunction pending appeal. "No public interest is served by maintaining an unconstitutional policy[.]" *Agudath Israel of Am. v. Cuomo*, 983 F.3d 620, 637 (2d Cir. 2020). As the *Orgel* court recognized, "enjoining the enforcement of a law that violates constitutional rights is always in the public interest," and the State faces no cognizable harm from being enjoined from enforcement that is likely preempted. *Orgel*, 2026 WL 474869, at *11 (citation modified). Connecticut will not lose its ability to apply its gambling laws to off-DCM activity. Instead, the status quo would persist, and there is no evidence that a brief injunction pending a Second Circuit appeal would harm Connecticut's gaming industry or the public. *See Churchill Downs*, 162 F.4th at 642-44. Kalshi will remain subject to CFTC regulation in the interim. The question in this case is not whether Kalshi should be regulated, but by whom. Congress's judgment was that regulation must come from the CFTC rather than a patchwork of fifty States.

## CONCLUSION

For the foregoing reasons, Kalshi respectfully requests that the Court grant an injunction pending appeal, or in the alternative, grant Kalshi administrative relief pending the Court's consideration of full briefing on Kalshi's motion. *See United States v. Texas*, 144 S. Ct. 797, 798-99 (2024) (Barrett, J., concurring).

Dated: August 13, 2026
Hartford, Connecticut

Respectfully submitted,

*/s/ Vanessa Roberts Avery*
Vanessa Roberts Avery (ct21000)
Snigdha Mamillapalli (ct31142)
**McCarter & English, LLP**
CityPlace I, 185 Asylum Street
Hartford, CT 06103
Telephone: (860) 275-6700
vavery@mccarter.com
smamillapalli@mccarter.com

Neal Katyal (admitted *pro hac vice*)
Joshua B. Sterling (admitted *pro hac vice*)
William E. Havemann (admitted *pro hac vice*)
**Milbank LLP**
1101 New York Avenue NW
Washington, D.C. 20005
Telephone: 202-835-7500
Facsimile: 202-263-7586
nkatyal@milbank.com
JSterling@milbank.com
WHavemann@milbank.com

Grant R. Mainland (admitted *pro hac vice*)
Andrew L. Porter (admitted *pro hac vice*)
Kelly D. Garcia (admitted *pro hac vice*)
**Milbank LLP**
55 Hudson Yards
New York, NY 10001
Telephone: 212-530-5000
Facsimile: 212-530-5219
GMainland@milbank.com
APorter@milbank.com

*Attorneys for KalshiEX LLC*

**CERTIFICATE OF SERVICE**

I hereby certify that on August 13, 2026, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated below. Parties may access this filing through the Court's CM/ECF System.

By: *<u>/s/ Vanessa Roberts Avery</u>*
Vanessa Roberts Avery (ct21000)